**Billy Joe SOWELL, Petitioner,**

v.

**Terry COLLINS, Warden, Respondent.**

No. 1:94CV237.

United States District Court,
S.D. Ohio,
Eastern Division.

March 31, 2008.

844

David Bodiker, Randall Lee Porter, Ohio Public Defender's Office, Columbus, OH, Mark Alan VanderLaan, Dinsmore & Shohl, Cincinnati, OH, for Petitioner.

Michael L. Collyer, Assistant Attorney General, Daniel R Ranke, Ohio Attorney General, Cleveland, OH, for Respondent.

### *OPINION AND ORDER*

EDMUND A. SARGUS, JR., District Judge.

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254. The Court's original disposition of this case was reversed by the Sixth Circuit Court of Appeals on June 23, 2004. *See Sowell v. Bradshaw*, 372 F.3d 821 (6th Cir.2004). This matter is before the Court upon remand from the Sixth Circuit for a decision on the merits of petitioner's remaining claims. For the reasons that follow, the writ of habeas corpus is conditionally granted.

### I. INTRODUCTION

This case does not turn on the propriety of capital punishment. That issue has been definitively addressed by the United States Supreme Court in pronouncements binding on this Court. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). It is, however, the obligation of this Court, under Article I § 10 of the Constitution and Section 2254 of Title 28, United States Code, to insure that the petitioner in this case has not been convicted or sentenced in violation of the Constitution of the United States.

This Court has recognized that it has no more important task than that of exercising its habeas corpus jurisdiction under 28 U.S.C. § 2254 in a case involving a sentence of death. *Sowell v. Anderson*, No. C–1–94–237, 2001 WL 1681142 (S.D.Ohio Oct.5, 2001) (citing *Roe v. Anderson*, C–1–96–825 (S.D. Ohio June 15, 2000)). The Constitution itself recognizes the writ of Habeas Corpus. U.S. CONST. ART. I, § 10. As the Supreme Court noted in *Williams v. Taylor*, 529 U.S. 362, 374–75, 120 S.Ct. 1495, 146 L.Ed.2d 389(2000):

> In 1867, Congress enacted a statute providing that federal courts "shall have power to grant writs of habeas corpus in all cases where any person maybe restrained of his or her liberty in violation of the Constitution, or any treaty or law of the United States." Act of Feb. 5, 1867, Ch. 28 § 1, 14 Stat. 385. Over the years, the federal habeas corpus statute has been repeatedly amended, but the scope of that jurisdictional grant remains the same.

Applying those principles to this case, the Court concludes that a writ should be granted as to petitioner's first argument because petitioner received ineffective assistance of counsel during the penalty phase of his capital trial.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In its June 23, 2004 Opinion and Order, the Sixth Circuit relied on the statement of facts set forth by the Ohio Court of Appeals:

The record discloses that [Sowell] and [Calvert] Graham resided in adjacent apartments on the third floor of an apartment building in downtown Cincinnati. [Sowell] was the resident manager of the building and became acquainted with Graham, who performed occasional odd jobs at the apartment building. After Graham became a resident in [Sowell's] apartment building, the two men developed a friendly relationship and visited one another in their respective residences.

On May 1, 1983, three days prior to the instant offenses, [Sowell] was a guest in Graham's apartment. Also present were Donna Edwards (Edwards), a woman with whom Graham shared the apartment, and [Pam] Billups [a former prostitute who had been visiting Graham and Edwards]. Graham offered two marijuana cigarettes to [Sowell], which he accepted. Thereafter [Sowell] left the apartment in the company of Billups and proceeded to a nearby restaurant where he purchased dinner for her. En route to the restaurant, [Sowell] smoked the second marijuana cigarette, having consumed the first at Graham's residence. Thereafter the pair made their way to a hotel where [Sowell] rented a room. There was conflicting testimony concerning the events that transpired thereafter. However, it is not disputed that [Sowell] eventually lost consciousness, having consumed an unspecified quantity of wine during the evening in addition to the marijuana. The next morning [Sowell] made his way back to his residence, stopping along his route to obtain breakfast for Billups.

[Sowell] next encountered Billups on the afternoon of May 4, 1983. Billups was in the company of Edwards and the trio passed in the doorway of a store but did not acknowledge one another. As will be seen, this seemingly inconsequential meeting gained significance later in the day.

That evening [Sowell] returned to his apartment building after, according to his testimony, visiting no less than five taverns and consuming at least one double shot of vodka at each stop. Upon returning to his apartment building [Sowell] realized that he was not in the mood to retire for the evening, and instead presented himself at Graham's apartment. Graham greeted [Sowell] and invited him inside, where Edwards and Billups were also present. Graham produced a marijuana cigarette which was consumed by all four occupants.

[Sowell] testified before the trial court that following the consumption of the marijuana, he fell asleep for a short time. When he awoke the others were still present and [Sowell] discovered that approximately $190 had been removed from his trouser pocket. At first [Sowell] thought that the trio was playing a joke upon him; however, his requests for the return of his money received no response. [Sowell] further testified that Graham then picked up a knife and ordered [Sowell] to leave the residence. [Sowell] complied and departed, but he was extremely angry as a result of his loss.

Both Billups and Edwards told the trial court that [Sowell's] visit to the apartment on the day in question was at first friendly. However, [Sowell] soon became agitated and accused Billups of being unsociable in that she did not

speak to him earlier that afternoon. [Sowell] also accused Billups of stealing $24 from him during their encounter three days earlier. When [Sowell] referred to Billups in terms meant to insult her pedigree, Graham ordered [Sowell] to leave the premises. [Sowell] left, stating that he was going to obtain his gun, return and shoot Billups.

[Sowell] went directly to his apartment where he directed his common-law wife, Lenora Waugh (Waugh), to bring his gun to him. Waugh complied with that request, as well as with [Sowell's] instructions to accompany him to Graham's apartment. Upon returning to Graham's door, Waugh, at [Sowell's] instruction, knocked and indicated to those inside that she was a woman named Portia. Graham responded to the door and opened it. Edwards and Billups testified, and the trial court found, that [Sowell] forced his way into the apartment, firing a bullet from his handgun into the ceiling as he entered. [Sowell] demanded to know Billups's whereabouts and threatened to shoot her. Graham was able to calm [Sowell] and began to escort him from the apartment and to close the door, whereupon [Sowell] suddenly turned and shot Graham in the abdomen. As Graham fell, [Sowell] fired a second shot into Graham's skull. Graham fell to the floor, mortally wounded.

[Sowell] next made his way to the closet in which Billups was cowering, and fired three bullets into her body. [Sowell] next placed the gun to Billups's forehead and pulled the trigger. However, the gun did not expel a bullet because it no longer contained ammunition. [Sowell] left the apartment after warning Edwards not to leave the premises or he would shoot her also. [Sowell] returned to his apartment, obtained money and made his way to a nearby tavern where he was apprehended by the police.

[Sowell] testified regarding the shootings and told the court that he returned to Graham's apartment to demand his money and that he was confronted by Graham, who was armed with a knife. [Sowell] stated that it was only after Graham made a furtive movement that [Sowell] began shooting at Graham, and that one of the bullets struck the ceiling. [Sowell] explained his conduct as follows: 'It just, I just clocked out. When I seen that person going this way I just pivoted, I pivoted on my gun, I was shooting, I was angry, I started shooting, I just started shooting everybody I seen.'

*Sowell v. Bradshaw*, 372 F.3d 821, 823–27 (6th Cir.2004) (quoting *Ohio v. Sowell*, No. C–830–835, 1986 WL 9082, *1–2 (Ohio Ct. App. Aug.20, 1986) (footnotes omitted)).

The following additional facts are relevant to the issues before the Court. On May 26, 1983, a Hamilton County grand jury indicted petitioner on one count of aggravated murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01(A), and one count of attempted murder in violation of O.R.C. § 2923.02(A) as it related to § 2903.01(A). The aggravated murder count contained a death penalty specification alleging that the aggravated murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

On October 14, 1983, petitioner, on the advice of counsel, waived his right to a jury trial and elected to be tried by a three-judge panel. Martin Pinales, one of petitioner's trial counsel, testified at the evidentiary hearing conducted by this Court that he received the impression, following a pretrial conference with the presiding judge, "that if a jury was waived,

this would not be a capital case." (Evid. Hrg. Tr., at 9). Attorney Pinales advised petitioner of his view that petitioner would be spared the death penalty if he waived a jury trial. (*Id.* at 45). Pinales testified that he believed that he "had one no death penalty vote in Judge Crush." (*Id.* at 46). Pinales clarified that Judge Crush never explicitly said that Sowell would be spared the death penalty if he waived a jury trial, but that Judge Crush seemed to suggest as much. (*Id.* at 50).

The guilt phase of the trial began on October 18, 1983, and concluded on October 20, 1983, with the three-judge panel unanimously finding petitioner guilty of both counts, as well as the death penalty specification to Count One. At the conclusion of the guilt phase, counsel for petitioner requested the preparation of a presentence investigation report ("PSI") by the probation department, and requested that the Court order a mitigation evaluation by a mental health professional. During the course of the presentence investigation, a member of the probation department learned of a rumor that petitioner had confessed to committing two other uncharged murders. The probation officer informed Judge Crush of the rumor, and Judge Crush requested that Dr. Nancy Schmidtgoessling of the Court Psychiatric Clinic explore the allegations with petitioner. It does not appear from the record that defense counsel were aware of the investigation that Judge Crush had initiated. Dr. Schmidtgoessling detailed her discussions with petitioner concerning the alleged other murders in a letter to Judge Crush dated October 27, 1983. (Supp. App., at 200–01). That letter was included as part of the PSI and made a part of the record without objection by defense counsel.

The sentencing phase of the trial commenced on November 2, 1983, and concluded on November 3, 1983. Counsel's mitigation strategy was to emphasize the good in petitioner, and virtually all of the evidence presented concerned good deeds performed by petitioner during his adult life. Counsel presented evidence that petitioner helped children, provided money and food to people in need, and tried to prevent crimes in his neighborhood. Counsel attempted to show that the offense was "brought on by the consumption of alcohol, by a friendship in which Billy Joe Sowell felt betrayed and by a hot temper." (Mit. Tr. at 2). Counsel emphasized that the murder of Graham occurred because petitioner was unable to control his temper, and not because petitioner had "cooly and carefully" calculated revenge. (*Id.*). Counsel presented evidence showing that despite his hot temper, petitioner "had shown much kindness and concern for other people in the community throughout his life." (*Id.* at 3). Counsel called five witnesses, each of whom testified briefly concerning petitioner's redeeming qualities. Additionally, counsel presented an unsworn statement by petitioner, and introduced all of the psychological evaluations of petitioner that had occurred both prior to the guilt phase and prior to the mitigation phase of the trial. Pursuant to § 2929.03(D)(1) of the Ohio Revised Code, the PSI that counsel requested was introduced, as required by law. The PSI included a summary of petitioner's entire criminal history, including offenses for which petitioner had been arrested but never convicted. The PSI also included information regarding petitioner's status as a parole violator, and information suggesting that petitioner had not adjusted well to prison life in the past. A recommendation of death by the Cincinnati Police Department was also contained in the PSI.

Despite the fact that petitioner grew up in extreme poverty and suffered severe

abuse and neglect as a child, counsel did not present any information concerning petitioner's childhood, background, or social history. Counsel did not call one family member to testify. The panel did not hear that petitioner was one of seven children, and the Sowell family was so poor that the children were malnourished and routinely had nothing to eat. The panel did not hear that petitioner began stealing food at a young age, and his infant brother died of starvation. The panel did not hear that petitioner had no shoes until he was five years old, and that he and his siblings were often bitten by rats.

Counsel did not present testimony that petitioner's father was a severe alcoholic, and when drunk, abused petitioner's entire family. The panel did not hear that petitioner's father once tied petitioner to a chair and beat him. The panel did not hear that petitioner's father was frequently absent from the home because of drinking and extramarital affairs, and he sexually abused one of petitioner's sisters. The panel did not hear that petitioner's parents married and began having children when his mother was only fifteen. His parents often left petitioner and his six brothers and sisters alone for periods of three to four days at a time. When his parents were absent from the home, petitioner, at a young age, was forced to assume a parental role to the other children. Petitioner's family lived in the basement of a home that was never completed, and the basement had no running water or electricity.

Petitioner began consuming alcohol and illicit drugs at a very young age. The panel did not hear that when petitioner was only fourteen, he left his home and moved to a junkyard where he lived in a tent. Petitioner began getting into trouble as a juvenile and in his mid-teens, he was sentenced in Kentucky and made to work in a coal mine. These facts concerning petitioner's background were not made known to the experts whose reports were submitted.

At the conclusion of the mitigation phase, and without any substantial knowledge of petitioner's background, the three-judge panel unanimously sentenced petitioner to death on Count One, and to a consecutive prison term of seven (7) to twenty-five (25) years on Count Two. In its sentencing opinion, the panel noted that petitioner "was not devoid of decent characteristics," but emphasized that petitioner's "life for the past thirty years has been one of chronic criminal behavior, much of its involving acts of violence." (Mitig. Tr., at 79). The panel noted that petitioner had been charged with assault, battery and menacing approximately twenty times, and that he had been jailed or imprisoned approximately twelve times. (*Id.*)

Represented by one of the two attorneys who had represented him at trial, along with a new attorney, petitioner appealed to the Court of Appeals for the First Appellate District. On August 20, 1986, the split panel of the court of appeals affirmed petitioner's convictions and sentence. *State v. Sowell*, No. C–830835, 1986 WL 9082, *17 (1st Dist.1986). Judge Hildebrandt filed a dissenting opinion, finding that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt, and finding that the imposition of the death penalty in petitioner's case was excessive, disproportionate and inappropriate. *Id.* at *19. Represented by the same two attorneys who had represented him before the court of appeals, petitioner appealed as of right to the Ohio Supreme Court. In an opinion issued on November 16, 1988, the Ohio Supreme Court affirmed petitioner's convictions and sentences, and independently found that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, and that the

death sentence was appropriate and proportionate. *State v. Sowell*, 39 Ohio St.3d 322, 530 N.E.2d 1294 (1988). The United States Supreme Court denied petitioner's petition for a writ of certiorari. *Sowell v. Ohio*, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989).

Petitioner, represented by the Ohio Public Defender, filed a postconviction action to vacate or set aside his convictions in the trial court on December 20, 1989. On May 4, 1990, the trial court issued findings of fact and conclusions of law denying the petition. Petitioner filed a timely appeal to the Court of Appeals for the First Appellate District. On June 26, 1991, the court of appeals affirmed the judgment of the trial court. *State v. Sowell*, 73 Ohio App.3d 672, 598 N.E.2d 136 (1st Dist.1991). Petitioner sought leave to appeal to the Ohio Supreme Court, and that court declined to accept jurisdiction. *State v. Sowell*, 62 Ohio St.3d 1456, 579 N.E.2d 1394 (1991).

In April 1992, petitioner filed a habeas corpus action in this Court. The Court dismissed his petition without prejudice for the failure to exhaust state court remedies. *Sowell v. Tate*, 1:92cv327, (S.D.Ohio July 14, 1992). Specifically, the Court directed petitioner to comply with the procedure for raising claims of ineffective assistance of appellate counsel that had recently been announced in *State v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992). On May 3, 1992, petitioner filed an application for delayed reconsideration in the court of appeals based on allegations of ineffective assistance of appellate counsel. On October 1, 1992, the court of appeals denied petitioner's application, finding that petitioner had failed to demonstrate good cause for the delay in filing the application.

Petitioner sought review of the court of appeals' decision in the Supreme Court of Ohio. In addition, petitioner filed a motion for delayed reinstatement of his direct appeal as of right in the Ohio Supreme Court. On November 17, 1993, the Ohio Supreme Court affirmed the decision of the court of appeals denying petitioner's motion for delayed reconsideration, and denied petitioner's motion for delayed reinstatement of his direct appeal as of right. The Ohio Supreme Court denied petitioner's motion for a rehearing on December 22, 1993.

Petitioner initiated the instant habeas corpus action on March 29, 1994, with the filing of a motion for the appointment of counsel. He subsequently filed his habeas corpus petition on May 24, 1994, wherein he raised fifty-two claims for relief. In the *Opinion and Order* of February 18, 1998, this Court dismissed claims 3, 33, 36, 47, 48 and 52 on the basis of procedural default. On October 5, 2001, the Court issued an *Opinion and Order* partially granting a conditional writ of habeas corpus as to petitioner's thirty-fourth ground for relief, finding that petitioner did not knowingly, intelligently and voluntarily waive his right to a trial by jury as to the sentencing phase of his capital trial, (Doc. # 155). This Court did not address petitioner's other grounds for relief. On June 23, 2004, the United States Court of Appeals for the Sixth Circuit reversed the Court's decision, finding that petitioner was not entitled to relief on his thirty-fourth ground for relief because he failed to demonstrate that his jury waiver was not knowing and intelligent. *See Sowell v. Bradshaw*, 372 F.3d 821 (6th Cir.2004). Moreover, the Sixth Circuit rejected the portion of petitioner's fifth ground for relief alleging that trial counsel were ineffective because they did not receive sufficient assurances that a jury waiver would avoid the death penalty. *Id.*

This Court reopened petitioner's case on November 16, 2004. (Doc.# 171). On No-

vember 13, 2006, the Court issued an Order permitting supplemental briefing on the merits of the remaining forty-five claims contained in the petition for a writ of habeas corpus. (Doc.# 176). On January 11, 2007, both petitioner and respondent filed supplemental merits briefs. (Doc.# 179; doc.# 180).

In petitioner's supplemental merits brief, petitioner notes that he consolidated his entire merits briefing into the supplemental merits brief so that the Court "will not have to page through several documents during its review." (Doc.# 180 at 1). In addition, petitioner asserts that he has "narrowed the grounds on which he is seeking relief." (*Id.*) Specifically, petitioner contends that his "1994 habeas petition contained claims that he originally raised in the state courts on direct appeal and post-conviction in the 1980's," and "[t]he jurisprudence of criminal law and capital litigation has changed significantly since that time." (*Id.*) Petitioner states that he "has chosen those grounds for relief which are still viable, given the changes in constitutional litigation over the last twenty years." (*Id.*) Petitioner sets forth eleven separate arguments upon which he alleges that he is entitled to habeas relief. In each of those eleven sections of his supplemental merits brief, petitioner references, by footnote, the corresponding grounds for relief contained in his original petition for a writ of habeas corpus wherein the arguments were initially made. Petitioner references seventeen of the remaining forty-five grounds for relief in his supplemental briefing, organizes those seventeen grounds for relief into eleven separate headings identified as arguments I through XI, and abandons the remaining twenty-eight grounds for relief contained in his original petition.

Although petitioner does not affirmatively identify the grounds for relief that he is now abandoning, it is apparent to the Court that petitioner is no longer pursuing claims 2, 6, 7, 10, 12, 13, 14, 16, 17, 20, 21, 22, 23, 24, 32, 35, 37, 39–46, and 49–51. Petitioner seeks habeas relief on the following claims set forth in his habeas petition: claims 25 and 27 (set forth as Argument I in his supplemental merits brief); claim 5 (set forth as Argument II); claim 26 (set forth as Argument III); claims 18 and 19 (set forth as Argument IV); claim 15 (set forth as Argument V); claims 28, 29, 30, and 31 (set forth as Argument VI); claim 4 (set forth as Argument VII); claims 8 and 9 (set forth as Argument VIII); claim 11 (set forth as Argument IX); claim 38 (set forth as Argument X); and claim 1 (set forth as Argument XI).

Respondent filed a supplemental merits brief on the same day as petitioner. Unaware that petitioner would be narrowing his grounds for relief, respondent's supplemental brief addressed, in one form or another, most of the claims contained in petitioner's habeas petition. Respondent renewed several procedural default arguments, noting that portions of this Court's February 19, 1998, *Opinion and Order* addressing procedural default "ha[ve] been undercut by subsequent Sixth Circuit caselaw." (Doc. # 179, at 1). In respondent's supplemental reply brief, filed on February 26, 2007, respondent "applauds and shares Sowell's desire to streamline the claims and deal with them in one comprehensive pleading," and notes that "[t]he litigation has come a long way since [petitioner's] 52 claim, 660 paragraph, non-page-numbered petition to the Supplemental Briefing, which consolidated the original claims into 11 arguments and 110 pages." (Doc.# 187, at 1). Respondent follows petitioner's format in addressing petitioner's newly ordered claims, and argues that all or part of arguments 3, 4, 6, 8, and 10 are procedurally defaulted. Respondent asserts that the remaining claims

are without merit. The Court will now consider petitioner's remaining claims.

## III. STANDARD OF REVIEW

The habeas corpus statutes were amended, effective April 24, 1996, by the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"). Because petitioner filed his habeas corpus action well before the effective date of the AEDPA, this Court's review of petitioner's constitutional claims is governed by habeas corpus law as it existed prior to the enactment of those amendments. *Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). That is, state court findings of fact are presumed correct, unless petitioner rebuts that presumption of correctness by clear and convincing evidence; questions of law, as well as mixed questions of law and fact, are reviewed *de novo* by this Court. *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir.1999). The pre-AEDPA standard "permits reviewing federal courts greater latitude in examining the proceedings than is permissible under AEDPA-governed cases," *Hamblin v. Mitchell,* 354 F.3d 482, 487 n. 2 (6th Cir.2003) (citing *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)), and entitles Sowell "to have the federal habeas court 'make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings.'" *Harries v. Bell,* 417 F.3d 631, 634 (6th Cir. 2005) (quoting *Buell v. Mitchell,* 274 F.3d 337, 344 (6th Cir.2001)). This Court "may grant the writ if the state-court conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 635. With these principles in mind, the Court will consider petitioner's remaining constitutional claims.

## IV. DISCUSSION

*ARGUMENT NO. I:* **THE ACTS AND OMISSIONS OF DEFENSE COUNSEL IN THE TRIAL PHASE DEPRIVED MR. SOWELL OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN THE MITIGATION PHASE.[1]**

In his first argument, petitioner claims that he was denied the effective assistance of counsel during the mitigation phase of his capital trial. The crux of petitioner's argument is that trial counsel failed to conduct an adequate sentencing phase investigation into his background and social history that would have allowed counsel to present a meaningful mitigation case on petitioner's behalf, and that trial counsel failed to retain necessary experts to testify regarding petitioner's brain impairment and his alcoholism. As a result of counsel's deficient performance, petitioner argues, the three-judge panel did not hear of the emotional and physical trauma that petitioner suffered as a child, how that trauma impacted petitioner's development, that petitioner suffered from severe alcoholism and alcoholic blackouts, and that petitioner had a brain impairment that hampered his ability to respond to stressful events. (Supp. Merits Brief, doc. # 180, at 8–9).

Ineffective assistance of counsel claims are governed by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in which the Supreme Court established a two-part inquiry:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made

---

1. This Argument includes the Twenty–Fifth and Twenty–Seventh Grounds for Relief. (Petition, doc. # 9, ¶¶ 434–450; 460–467).

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052. In other words, a habeas petitioner must show that his counsel's performance "fell below an objective standard of reasonableness," *Id.* at 687–88, 104 S.Ct. 2052, and that counsel's performance was "prejudicial to the defense." *Id.* at 692, 104 S.Ct. 2052. Because a habeas petitioner must satisfy both the performance and the prejudice prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if a reviewing court determines that the petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697, 104 S.Ct. 2052.

When evaluating counsel's performance, *Strickland* requires the Court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. The Court must make every effort to avoid "the distorting effects of hindsight," and the Court must " 'judg[e] the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " *Morales v. Mitchell,* 507 F.3d 916, 930 (6th Cir.2007) (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

The importance of competent representation during the penalty phase of a capital trial cannot be understated, and counsel's "constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is 'well-established.' " *Harries v. Bell,* 417 F.3d 631, 637 (6th Cir.2005) (quoting *Coleman v. Mitchell,* 268 F.3d 417, 449 (6th Cir. 2001)). In a capital trial, "[t]he sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility." *Carter v. Bell,* 218 F.3d 581, 596 (6th Cir.2000).

■ To establish the second prong of the *Strickland* test, *i.e.,* prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. When a petitioner has been sentenced to death, "the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Fautenberry v. Mitchell,* 515 F.3d 614, 626 (6th Cir.2008) (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A habeas petitioner does not establish the prejudice element where he shows only that his counsel failed to present cumulative mitigation evidence. *Broom v. Mitchell,* 441 F.3d 392, 410 (6th Cir.2006). Rather, " 'to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.' " *Fautenberry,* 515 F.3d at 626 (quoting

*Clark v. Mitchell,* 425 F.3d 270, 286 (6th Cir.2005)).

## A. The Evidence Presented

■ The Court will begin its analysis of petitioner's claims of ineffective assistance of counsel by considering what evidence trial counsel presented to the three-judge panel on petitioner's behalf. The evidence presented at petitioner's mitigation hearing consisted of an unsworn statement by petitioner, the testimony of five witnesses, and the submission of several psychological reports. Also before the panel was a Presentence Investigation Report ("PSI") prepared by the probation department, at defense counsel's request.

In his unsworn statement, petitioner expressed regret and apologized for killing Calvert Graham. (Mit. Tr. at 7). Petitioner testified that he had always tried to help people. He told the panel that when he met Lenora Waugh, the mother of his two youngest children, she was sleeping in a bus station. Petitioner offered her a place to stay (*Id.* at 10). Petitioner told the panel of his efforts to help a seventeen month old boy in his neighborhood. (*Id.* at 12). Petitioner explained that the child's parents permitted the toddler to wander the neighborhood unattended, and that he saved the boy from being struck by a car. The boy's mother asked petitioner to adopt the boy, and petitioner took the child into his home, provided him with medical attention, clothed him and inquired about adopting the child. Ultimately, the Hamilton County Department of Human Services interceded and petitioner relinquished physical custody of the boy to his parents. (*Id.* at 12–15).

Petitioner testified that he grew up in areas of Chicago, Milwaukee and Rockford, Illinois where violence was a way of life. (*Id.* at 11). Petitioner explained that he had to learn to protect himself at a young age. (*Id.*). Petitioner told the panel that he tried to work hard, and maintain employment, despite being disabled due to a back injury. (*Id.* at 12).

Defense counsel called Rita Reick and Georgia Stahl to testify. Both women were employed by the Hamilton County Municipal Probation Department. Rita Reick testified that she knew petitioner because he had been on probation. (*Id.* at 18). Petitioner worked in an area through which Reick had to pass at the end of the work day to reach her car. Reick testified that petitioner prevented her from being robbed on one occasion, and that she considered him a protector because he would look out for her several times a week. (*Id.* at 19–20). She told the court that petitioner was very proud of his young daughter. (*Id.* at 21).

Gerorgia Stahl testified that she worked as a cashier for the probation department, and that she met petitioner when he came to pay his fines. Like Rita Reick, Shahl walked by petitioner's place of employment every day on her way to and from work. Stahl testified that petitioner would look out for her, and that he prevented her from being mugged on two different occasions. (*Id.* at 32). She explained that she would look for petitioner during her walks, that she considered him a protector, and that she had "only seen good in Billy." (*Id.* at 33–35). Stahl stated that she cried when she heard that petitioner had been arrested. (*Id.* at 35).

Defense counsel also called Nancy Davis, who testified that she had known petitioner for approximately five or six years, and that he frequented the convenience store in which she had previously worked as a clerk. (*Id.* at 23). She stated that she could rely on petitioner to substitute for her without payment, during which time he waited on customers and had access to the cash register. (*Id.* at

24–25). She testified that petitioner prevented the store from being robbed on one occasion. (*Id.* at 24).

Defense counsel also called Steve Applebury to testify. Applebury testified concerning petitioner's employment. Applebury stated that petitioner possessed good work traits, that petitioner was honest, that he was trusted with money, and that he was a very generous person. Applebury testified that petitioner had a reputation as being kind-hearted and that petitioner would share his food and money with others if they were in need. (*Id.* at 29–30).

Finally, Lenora Waugh testified on petitioner's behalf. She stated that petitioner took her into his home when she was homeless, even though they did not develop a relationship until approximately six months later. (*Id.* at 37). She related that she considered their current relationship to be a common-law marriage during which they had two children. She concluded by telling the court that petitioner was very kind and a good father. (*Id.* at 38, 40).

Counsel did not present during either phase of petitioner's trial expert testimony concerning petitioner's mental state. The record discloses that prior to trial, the court appointed two psychiatrists, Dr. Emmett Cooper and Dr. James Titchner, and one psychologist, Dr. William Walters, to evaluate petitioner in order to determine his competency to stand trial and his mental state at the time of the offense. (Cooper Insanity Report, Supp.App. at 155–156; Cooper Competency Report, Supp.App. at 154; Tichener Competency Report, Supp.App. at 16; Tichener Insanity Report, Supp.App. at 163–167; Walters Insanity Report, Supp.App. at 168–170). At the conclusion of the guilt phase of the trial, defense counsel requested that a psychological evaluation of petitioner be performed for purposes of the mitigation hearing. Pursuant to that request, the court appointed Dr. Nancy Schmidtgoessling of the Hamilton County Court Clinic and reappointed Dr. Cooper to prepare reports for the mitigation phase. (Cooper Report, Supp.App. at 157–158; Schmidtgoessling Report, Supp.App. at 159–161). Counsel for petitioner chose not to hire or request any of their own mental health experts, and relied instead on the reports generated by the court's experts. At the beginning of the mitigation hearing, counsel submitted all of the written reports for the trial court's consideration, and chose not to present live testimony from any of the experts.

Dr. Cooper's report regarding petitioner's mental state detailed that petitioner had been disabled for some time with a back injury. (Supp.App., at 155). Dr. Cooper noted that petitioner had two previous psychiatric treatment episodes, one as a teenager for behavioral problems and another when he was in prison because of social withdrawal, but Dr. Cooper did not provide any detail regarding those episodes. (*Id.*). Dr. Cooper reported that petitioner had no family history of psychiatric illness. Dr. Cooper concluded that petitioner did not meet the criteria for Not Guilty by Reason of Insanity, and that although petitioner was depressed enough to warrant psychiatric treatment, petitioner did not suffer from a mental disease or defect. (*Id.* at 156). Dr. Cooper determined that petitioner was competent to stand trial because petitioner understood the charges against him, and petitioner had sufficient cognitive and emotional capacities to assist counsel in his defense. (*Id.* at 154).

Dr. James Titchener evaluated petitioner to determine his competency to stand trial. Dr. Titchener concluded that petitioner possessed above average intelli-

gence. (Supp.App., at 163). Dr. Titchener stated that petitioner suffered from "severe psychological difficulty," (*Id.*), and noted that petitioner exhibited a "real emotional disturbance" during the interview. (*Id.* at 165). Dr. Titchner opined that petitioner was "the type of person who lets others take advantage while he stringently over-controls his hostility and redirects it at himself. The defense of altruism is used to contain affect." (*Id.* at 163). Dr. Titchener determined that petitioner "appears to tolerate and to submit to the abuses of others until finally he erupts with a feeling he himself cannot describe or understand because he hardly ever lets himself experience it." (*Id.* at 163).

With respect to petitioner's family background, Dr. Titchener provided the following information to the panel:

> There was some review of family history and an intensely ambivalent relationship to the defendant's mother who died in September of 1982. Mother had been good in some ways but a distant person and one who could not be satisfied with her marriage and family and frequently left it, finally divorcing husband when patient was sixteen. I think this historical background has explanatory power in that it shows us why this is a man who had to control his anger, stimulated often by his mother's abandonment, in order to somehow retain and cling to the tenuous relationship with her.

(*Id.* at 165).

Dr. Titchener diagnosed petitioner with "[i]solated or intermittent explosive personality disorder, manifested by the sudden appearance of uncontrollable aggressive impulses resulting in assault on a man and a woman." (*Id.* at 165–66). Dr. Titchener stated that "[t]his disorder appears in the absence of generalized impulsivity or aggressiveness between episodes," and

that in his experience, the disorder "occurs exclusively in individuals who do not experience hostility and who extremely over-control it." (*Id.* at 166). Dr. Titchener believed that petitioner experienced a crisis, "specifically the intense control and fear in this man of his aggressive impulses which then erupted in the special situation of feeling the exploited fool." (*Id.*)

Dr. Titchener concluded:

> The alcohol and the marijuana were responsible for the loss of control which this man usually very carefully maintains.
>
> . . . .
>
> In my opinion, this man does not suffer from mental disease or defect which would interfere with his capacity to differentiate between right and wrong. However, it is also my opinion that he suffers from mental disease or defect which would interfere with his capacity at the time of the offense to act upon his awareness of the distinction between right and wrong.
>
> This is a most righteous man with a high moral sense and a great need to suppress and control hostility along with the parallel sense that his altruism and his goodliness wins him no love or favor from others, so the hostility mounts and exploded in the special situation of his feeling intensely exploited, helped by the tremendous lowering of controls brought about by the heavy consumption of alcohol and at least two marijuana cigarettes.

(*Id.*).

William Walters, Ph.D., a clinical psychologist, evaluated petitioner to determine his mental state at the time of the offenses. Dr. Walters met with petitioner at the Hamilton County jail on three occasions and administered the Minnesota Multiphasic Personality Inventory

("MMPI") and the Quick Test. (*Id.* at 168). Additionally, Linda Merritt, a clinical social worker, interviewed petitioner, and she contacted Lenora Waugh, petitioner's father, Attorney Pinales, two neighborhood acquaintances, the investigating officers and prosecutors. (*Id.*).

Dr. Walters reported that petitioner's intellectual level, as measured by the Quick test, was in the lower 21st percentile of the general population. (*Id.*). Dr. Walters found petitioner to be "a man of less than average intelligence with a rather fragile self-esteem that he frequently bolsters through his attempts to help others." (*Id.* at 170). Dr. Walters described petitioner as depressed and sad, and noted that petitioner experienced periodic outbursts of sobbing during the evaluation. (*Id.*).

Petitioner reported to Dr. Walters that his father was a "strict disciplinarian," yet petitioner felt that his father's punishments were just. (*Id.* at 169). Dr. Walters described the Sowell family as very poor but provided no further information. The report noted that petitioner's mother and sister had died within the past year. (*Id.*).

Dr. Walters opined that petitioner's "characterological style of giving" to others was deeply engrained, and that petitioner frequently believed himself to have been victimized by others he had helped. (*Id.* at 170). Petitioner's need to give to others, Dr. Walters explained, coincided with a "rather child like and naive belief that others will recognize him as 'a good guy' and appreciate him. Yet, Mr. Sowell frequently feels devastated and enraged when this behavior on his part is interpreted as weakness, precipitating attempts by others to take advantage of him." (*Id.*). According to Dr. Walters, "these blows to his self-esteem are difficult to tolerate, and Mr. Sowell has a potential to respond with rage." (*Id.*). This potential is "significantly magnified when he has been drinking alcohol." (*Id.*).

Dr. Walters concluded:

It is the opinion of this examiner that Mr. Sowell was not suffering from a mental disease or defect of the mind at the time he committed the alleged offenses. Rather, Mr. Sowell's characterological style is one of being frequently disappointed by others which results in an angry counterattack. Moreover, this behavior is severely exaggerated when he is under the effects of alcohol, which was the case on the day of the alleged offense. Any impairment in ability to refrain from the alleged behavior was due to a lethal combination of character style and alcohol. Thus, Mr. Sowell's ability to detect right from wrong or ability to refrain from the impulse was not impaired due to mental illness.

(*Id.*)

After the guilt phase of petitioner's trial, Dr. Cooper conducted a psychological evaluation of petitioner for purposes of the mitigation hearing. Dr. Cooper's report, which was only a few paragraphs long, was devoid of any information concerning petitioner's background and social history. Dr. Cooper determined that petitioner "manifested no signs or symptoms of mental disease or defect." (*Id.* at 157). Dr. Cooper believed that the following issues contributed to petitioner's conduct:

1) He was under the influence of alcohol and marijuana at levels which seriously impair rational thinking, judgment, and impulse control,

2) He felt betrayed by individuals he had considered his friends, believing that they had stolen money from him as he slept, and

3) He felt that his physical well-being had been threatened by Mr, Graham,

and believed he was provoked to protect his property and safety in the manner in which he responded.

(*Id.* at 157–58). Dr. Cooper concluded it was likely that "the combined [e]ffect of these factors in an individual who has been disabled since 1971, and undergoing a number of personal stresses resulted in the behavior which culminated in the offenses." (*Id.* at 158).

As part of her psychological evaluation of petitioner for use in the mitigation hearing, Dr. Schmidtgoessling interviewed petitioner for approximately two hours, conducted approximately four hours of psychological testing over a two day period, and reviewed records of the Court Clinic's past contact with petitioner, specifically the NGRI evaluation. (*Id.* at 159). With respect to petitioner's background, Dr. Schmidtgoessling indicated that petitioner felt he had a "rough childhood" and "an unhappy home life." (*Id.*) Petitioner reported that as a child, "there was a lack of adequate food, clothing and material goods as well as lack of close parental nurturance." (*Id.*) Petitioner described his early social relations as being marked by intimidation and a need to learn to defend himself (*Id.*) Petitioner relayed that gangs were prevalent and he "had to know how to use a knife, it was expected." (*Id.*) At an early age, petitioner felt that he was "on his own," and he worked odd jobs, skipped school, and would run away for a couple of weeks at a time. (*Id.*). Dr. Schmidtgoessling deduced that petitioner's early life experiences "left him feeling abandoned, angry, without significant stable relationships, and conscious of the need to defend himself in a dangerous, hostile environment." (*Id.* at 159–60)

Petitioner confided in Dr. Schmidtgoessling that he began "wandering around from the age of 14 or 15." (*Id.* at 160). He admitted to many fights and being "in and out of jails for such charges as assaults and carrying weapons," (*Id.*) Petitioner reported being in prison twice, and denied killing anyone prior to the offense at hand.

Petitioner stated that he had been married once. The marriage lasted only two years and petitioner "mourned his loss by drinking alcohol to excess for a year or so. During this time he suffered blackouts, neglected his appearance and health and remained depressed all the time." (*Id.*) After another failed relationship, petitioner reported going on a "drinking binge" for a year or two. Petitioner stated that he had never received psychiatric treatment or treatment for alcohol abuse. (*Id.*) Dr. Schmidtgoessling noted that "on the MMPI, Mr. Sowell's score on a scale which is highly accurate in separating alcoholics from nonalcoholics placed him in the alcoholic range." (*Id.*) Dr. Schmidtgoessling opined that petitioner "minimizes his alcohol use" but "admits to using marijuana daily." (*Id.*)

Dr. Schmidtgoessling determined that petitioner possessed less than average intelligence, that his insight and thought processes were mildly impaired, and that he suffered from chronic social maladjustment. (*Id.* at 160). She concluded that:

Personality testing and history show that Mr. Sowell is an angry, resentful, argumentative individual who finds it very difficult to feel that his needs are adequately met in interpersonal relations. He is extremely sensitive to slight or criticism, which he may perceive where others don't. Because of this, particularly if he feels he has been slighted or has lost face in front of others, unpredictable and irrational anger outbursts occur periodically. Externalization of blame is seen in Mr. Sowell, as well as a lack of insight and psychological mindedness.

\* \* \*

In summary, Mr. Sowell is a very vulnerable, empty man who craves acceptance and accolades from others so that he can see himself as worthwhile.

\* \* \*

At the time of the offense he had apparently been drinking alcohol and using marijuana, and felt that he had been ripped off by people he had previously shown friendship and generosity to. There is no evidence that at the time of the offense—or ever in his life—that Mr. Sowell suffered from a mental disease or defect. He certainly did and does now suffer from a chronic personality disorder marked by serious problems in interpersonal relations and impulse control.

(*Id.* at 160–61).

The PSI was also admitted into evidence. The PSI provided a factual summary of the offense and contained a section addressing victim impact. That section included statements from Pam Billups, Calvert Graham's brother, and Specialist Ronald Camdon of the Cincinnati Police Department. With respect to petitioner's background, the PSI stated that petitioner had eight years of education, that he had a history of previous psychiatric care in Rockford Illinois, that he was previously married, that he provided financial support for his children, and that he was disabled. The portion addressing petitioner's criminal history outlined petitioner's entire criminal record, including offenses for which petitioner had been arrested but never convicted, and noted that petitioner had previously been a parole violator, that he had multiple arrests in Illinois, and that he had not adjusted well to prison life in the past. (*Id.* at 187–192).

## B. Petitioner's Claims

### 1. *Sentencing Phase Investigation*

Petitioner argues that his trial attorneys conducted little to no investigation into his background and his personal and family history in preparation for the mitigation phase of his trial. Petitioner claims that counsel failed to interview members of his family, failed to obtain a mitigation specialist/investigator, and relied on the PSI prepared by members of the probation department who were not trained to conduct a mitigation investigation. The Court will address petitioner's arguments in turn.

First, petitioner argues that his counsel failed to interview members of his family and others who knew him throughout his life. Specifically, petitioner claims that counsel failed to interview his employer, his paternal aunt Ann Simpson, local businessman Walter Gabennesh, his friend and bail bondsman Leroy Jones, his great uncle Bobby Lee Horton, his youngest brother Larry Sowell, his co-worker Jimmy Wilcox, and his father, Henderson Sowell Sr. Counsel failed to call a single member of petitioner's family to testify in mitigation, other than his common law wife, Lenora Waugh, who met with counsel only once before her testimony. With respect to the witnesses who did testify for the defense, petitioner argues that his counsel did not adequately interview them prior to their testimony, and that several of those witnesses testified not as a product of defense counsel's investigation, but because those witnesses contacted defense counsel and volunteered to testify on petitioner's behalf. (Doc. # 180, at 13).

Next, petitioner argues that his counsel violated their duty to investigate because they did not request the appointment of a mitigation specialist to assist in identifying, interviewing and preparing witnesses for the mitigation hearing. Petitioner maintains that counsel in a capital case

cannot satisfy their obligation to conduct a thorough investigation into a defendant's life history, family background, and formative environment without the assistance of investigators and mitigation specialists trained to identify environmental and biological factors that affect a person's development. (*Id.* at 12). Petitioner argues that a mitigation investigator was necessary in his case because most of his family members and many of the records concerning his past were located in either Illinois or Alabama. As a result of those distances, trial counsel were unable to interview several individuals who had valuable information concerning petitioner's development and childhood. Petitioner maintains that a mitigation investigator would have assisted counsel by traveling to interview petitioner's family, and by reviewing the school and hospital records that were located out of state.

Finally, petitioner claims that counsel's performance was deficient because in lieu of conducting their own mitigation investigation, counsel relied on the Hamilton County Adult Probation Department to prepare a presentence investigation report ("PSI"). Counsel's request to have the probation department prepare a PSI did not fulfill counsel's obligation to conduct an independent investigation, petitioner argues, because the probation authorities were not trained to conduct as comprehensive an evaluation as required for the preparation of a mitigation case on behalf of the defense. Additionally, the PSI contained damaging information that would otherwise have been inadmissible, such as petitioner's criminal record, the fact that petitioner had previously been a parole violator, that petitioner had twenty arrests in Illinois, and that petitioner had adjusted poorly to prison in the past. (*Id.* at 31).

Petitioner argues that his counsel were ill-equipped to present a meaningful case in mitigation due to their failure to conduct an adequate sentencing phase investigation. Petitioner notes that "[o]n the morning of November 2, 1983, defense counsel gave their opening statement in mitigation. By lunch time, defense counsel had completed their mitigation phase presentation including closing argument. Defense counsel called six witnesses whose direct examination totals only thirty-four pages in the transcript." (Doc. # 180, at 8). According to petitioner, the testimony presented by defense counsel was limited to the good character traits of petitioner, and the witnesses offered no insight into the emotional trauma that petitioner experienced during his formative years. (*Id.*)

Due to counsel's failure to conduct an adequate investigation, petitioner argues, a wealth of mitigating evidence was not presented to the three-judge panel. Petitioner has submitted affidavits from several individuals, including family members, who have stated that they were ready and willing to testify at the mitigation hearing but were not interviewed by counsel. Petitioner argues that the following mitigating evidence was not presented to the panel.

Petitioner grew up in extreme poverty. He was born in 1937, and spent the first nine years of his life living in Alabama. The family experienced "blatant discrimination that was an inherent part of being black in the rural South during the 1940's." (Hawgood Affidavit, Supp.App., at 230). Both of petitioner's parents were from broken families and neither had adequate parenting skills. The Sowell family included six children, and they were often without adequate food, clothing, shelter and other basic necessities. Petitioner was forced to steal food in order for his siblings and him to survive. (Doc. # 180, at 19). When petitioner was eight years old, his infant brother died of starvation. (Hawgood Affidavit, Supp.App., at 226). Peti-

tioner recalls that as small children, he and his siblings were bitten by rats, were infected with ringworms, and lacked sufficient clothing. (*Id.*) Petitioner did not get his first pair of shoes until he was five years old. (*Id.*) The family lived in a three bedroom trailer that had no indoor plumbing. When he was nine, the Sowell family moved to Illinois and lived in the basement of an unfinished house. The basement home had no electricity or running water.

Petitioner's father, Henderson Sowell, Sr., was, by several accounts, a serious alcoholic and a violent man. He became involved in extramarital affairs and would leave the basement home for long periods of time. Petitioner states that when his father was home, "the family was in a state of constant chaos and fear." (Doc. #180, at 20). Petitioner's father, when intoxicated, would beat petitioner's mother and the children, including petitioner. Petitioner's father demanded control and organization, and reacted violently when those conditions were not met. In order to avoid such reactions, the Sowell children would not speak while he was in the basement. (Affidavit of Henderson Sowell, Jr., Supp. App., at 248). Petitioner's father tied petitioner and his sister Joann to a chair and beat them. (Affidavit of Catherine Jones, Supp.App., at 260). Petitioner's father sexually abused petitioner's sister Catherine. (*Id.*).

Petitioner's mother was so terrified of his father that she would not try to protect her children from his drunken outbursts. She often fled the home, leaving the children to defend themselves. (Supp.App., at 248). Petitioner's parents eventually divorced, and petitioner and three of his siblings remained with their father in the basement home. Petitioner's father would leave the children for long periods of time while cavorting with other woman. Petitioner was forced to act as a surrogate parent for his siblings. Because his father was frequently gone, the children had no food. Petitioner would go to his mother's home and beg for food.

Petitioner began to use drugs and consume alcohol when he was thirteen. When he was only fourteen, petitioner left the basement home and began living in a tent at a local junk yard. During the next two years, petitioner was arrested more than twenty times, mostly for drunken and assaultive behavior. According to petitioner, he "had developed a Jekyll and Hyde personality. On one hand, when he was sober, he was a very generous person. However, when he had been drinking he became very combative." (Doc. #180, at 22). Petitioner was sent to a juvenile facility in Kentucky where he was forced to work in a coal mine. After working in the coal mine, petitioner returned to Illinois. He was convicted of forging a seventy-two dollar check and served nine years in an Illinois State prison. When he was released, he moved to Cincinnati to start a new life. He maintained employment, and tried to help others who needed money and food.

Finally, petitioner argues that the panel did not learn that his siblings "have not fared any better in life." (*Id.*, at 23). His sister Joanne became a prostitute and killed her pimp. His brothers Henderson Jr. and Benny served time in prison. His brother Larry served time for manslaughter. Four of the six Sowell children were, at one time or another, alcohol or hard drug addicts. (Hawgood Affidavit, Supp. App., at 233).

According to petitioner, he was prejudiced by counsel's deficient performance during the mitigation phase of his trial because counsel were unable to present to the panel information concerning the connection between his abusive background and the commission of the offense. Peti-

tioner maintains that during his formative years, he developed "an extreme sense of anger, inadequacy, and longing for acceptance." (Doc. #180, at 25). Due to the lack of familial resources and nurturing from his parents, petitioner "felt misused, abandoned, unappreciated, and victimized," and "learned that an appropriate response to frustration was physical violence." (*Id.*). Petitioner argues that there is a reasonable likelihood that at least one member of the three-judge panel would have voted in favor of a sentence less than death if the panel had been informed of petitioner's dysfunctional childhood, and the resulting impact of that childhood on his development and commission of the offense, and if the panel had not learned of all the damaging and otherwise inadmissible information contained in the PSI.

Petitioner presented his allegations of ineffective assistance of counsel during mitigation to the state courts during his state postconviction proceedings. Petitioner submitted the affidavits of fourteen members of his family outlining his background and character in support of his claim that trial counsel failed to interview members of his family. With respect to his claim that his counsel should have requested a mitigation specialist, petitioner submitted the affidavit of a mitigation specialist who attested to the assistance that her expertise could lend to defense counsel preparing for a mitigation hearing in a death penalty case.

The court of appeals considered and rejected petitioner's claims. The court determined that the information contained in the affidavits of family members was merely cumulative of the evidence considered by the trial court during the penalty phase of the trial. *State v. Sowell,* 73 Ohio App.3d 672, 681, 598 N.E.2d 136 (1st Dist. 1991). The court held that "[i]n the absence of proof of a reasonable probability that, but for this alleged omission of counsel, the result of his trial could have been different, Sowell's challenge to the effectiveness of counsel in this respect fails." *Id.* Furthermore, the court concluded that petitioner failed to demonstrate a particularized need for the assistance of a mitigation investigator, finding that " 'the experts sought here would have been no more than consultants to counsel as opposed to sources of evidence relevant to disputed factual issues.' " *Id.* (citing *State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264 (1984)). Because the court concluded that petitioner could not establish a basis for such assistance, the court held that petitioner's counsel neither violated an essential duty to petitioner, nor prejudiced the defense by failing to request a mitigation specialist. *Id.*

The question before this Court is whether petitioner's trial attorneys performed unreasonably and to petitioner's prejudice in failing to conduct a comprehensive investigation into petitioner's background and social history, in failing to interview and subpoena certain family members and friends to testify, and for requesting the preparation of a PSI. For the reasons that follow, the Court finds that counsel performed deficiently by failing to discover, develop or present substantial mitigating evidence concerning petitioner's background and social history, and that there is a reasonable probability that had counsel done so, at least one member of the three-judge panel would have voted against the imposition of the death penalty,

a. Deficient performance

In evaluating counsel's performance, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and make every effort "to eliminate the distorting effects of hindsight." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

The Court must objectively review counsel's performance in the context of prevailing professional norms, and the Supreme Court has referred to the standards of the American Bar Association ("ABA") as guides to determining what is reasonable representation in a capital case. *See Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Although petitioner's trial occurred before promulgation of the standards, "[c]onsidering counsel's performance in light of the current ABA Guidelines is proper despite the fact that the ABA Guidelines were issued well after Petitioner's trial, as the ABA Guidelines represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases." *Haliym v. Mitchell*, 492 F.3d 680, 717 n. 28 (6th Cir.2007) (applying 2003 ABA guidelines to a case tried in 1987); *see also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir.2003) (applying the 1989 and 2003 ABA guidelines to the petitioner's case which was tried in 1983).

In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court recognized that the ABA Guidelines set the applicable standards of performance for counsel in a capital case:

> The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having ac-

quired only rudimentary knowledge of his history from a narrow set of sources. *Id.* at 523, 123 S.Ct. 2527. Furthermore, "[a]mong the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile corrections experience, and religious and cultural influences." *Hamblin*, 354 F.3d at 486 (citing *Wiggins*, 539 U.S. at 523, 123 S.Ct. 2527) (emphasis added). The 2003 ABA guidelines state that "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." *Id.* at 487 n. 2. The guidelines further provide that counsel need to explore family and social history, including physical, sexual or emotional abuse, and family history of mental illness, cognitive impairments, substance abuse or domestic violence, as well as poverty and familial instability. *Id.*

In assessing counsel's investigation, this Court must consider "whether counsel adequately followed up on the 'leads' that were available to them." *Haliym v. Mitchell*, 492 F.3d 680, 710 (6th Cir.2007). Counsel must not "abandon their investigation at an unreasonable juncture" and a reviewing court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S.Ct. 2527. *See also Harries v. Bell*, 417 F.3d 631, 639 (6th Cir.2005) (finding that interviews conducted by counsel "produced viable leads regarding Harries's poor mental health and troubled family background" and "[c]ounsel's failure to follow these promising leads leaves no 'room for debate' that their truncated investigation was deficient").

With respect to counsel's duty to investigate, the Sixth Circuit has stated that "notwithstanding the deference *Strickland*

requires, neither this court nor the Supreme Court has hesitated to deem deficient counsel's failure to fulfill this obligation." *Harries*, 417 F.3d at 637. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding counsel's failure "to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood" deficient); *Morales v. Mitchell*, 507 F.3d 916, 934 (6th Cir.2007) (counsel ineffective for failing to present evidence of abuse and neglect during the petitioner's early childhood, his dysfunctional family, his repeated head injuries, and his significant alcohol and drug abuse); *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir.2003) (counsel ineffective for failing to discover and present "substantial evidence of a childhood in which abuse, neglect, violence and hunger were common"); *Coleman v. Mitchell*, 268 F.3d 417, 450–51 (6th Cir.2001) (counsel failed to discover Coleman's history of abandonment and neglect, physical and psychological abuse, pedophilia, hospitalization for head injuries, and that he had dropped out of school in the ninth grade); *Greer v. Mitchell*, 264 F.3d 663, 678 (6th Cir.2001) (counsel did not follow-up on knowledge of family history which included violence, foster case, incarceration, and alcoholism); *Carter v. Bell*, 218 F.3d 581, 596–97 (6th Cir.2000) (counsel failed to investigate childhood history of violence and instability); *Glenn v. Tate*, 71 F.3d 1204, 1208 (6th Cir.1995) (writ granted where counsel failed to look into any of the petitioner's medical records or interview any family members or others who knew him).

In deciding whether it was unreasonable for counsel to fail to present any evidence of Sowell's upbringing, the Court's "principal concern" is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Sowell's] background *was itself reasonable*." *Har-*

*ries*, 417 F.3d at 637. For the reasons that follow, the Court finds that counsel failed to conduct a constitutionally adequate investigation into petitioner's background in preparation for the penalty phase of his trial.

In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court determined that the petitioner, Wiggins, was deprived of competent representation when his counsel abandoned their investigation of his background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524, 123 S.Ct. 2527. Defense counsel had requested a PSI and records kept by the Baltimore City Department of Social Services ("DSS") describing Wiggins's placements in foster care as a child. *Id.* at 523, 123 S.Ct. 2527. Defense counsel also had Wiggins examined by a psychologist in preparation for trial. *Id.* The Supreme Court held that "[c]ounsel's decision not to expand their investigation beyond the PSI and DSS records fell short of the professional standards that prevailed in Maryland in 1989," which required "the preparation of a social history report," and of the standards promulgated by the ABA, "standards to which we long have referred as guides to determining what is reasonable." *Id.* at 524, 123 S.Ct. 2527.

The Supreme Court held that the scope of counsel's investigation "was also unreasonable in light of what counsel actually discovered in the DSS records." *Id.* at 525, 123 S.Ct. 2527. The records contained the following information:

The records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent lengthy absences from school;

and, on at least one occasion, his mother left him and his siblings alone for days without food.

*Id.* The Supreme Court deemed it unreasonable that counsel "chose to abandon their investigation at an unreasonable juncture" because "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525–28, 123 S.Ct. 2527.

The Court finds that petitioner's case closely resembles that of *Wiggins.* Sowell's trial counsel did not request or obtain a mitigation specialist or investigator, and instead relied on the investigations of others who were not trained to conduct the type of investigation required in a capital case. Counsel failed to investigate highly relevant mitigating evidence of petitioner's family background. Counsel relied on the information contained in the PSI and the brief mitigation reports prepared by Drs. Schmidtgoessling and Cooper, and did not "dig deeper" and investigate several leads contained in those reports. Counsel did not call one family member to testify, and there is no evidence that counsel conducted even the most basic interviews with petitioner's siblings and other family members for the purpose of investigating petitioner's background. Like *Wiggins,* counsel abandoned their duty to investigate after "having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524, 123 S.Ct. 2527.

This Court cannot escape the conclusion that petitioner's counsel "were or should have been on notice that an investigation into Petitioner's family background would have been fruitful." *Haliym v. Mitchell,* 492 F.3d 680, 712 (6th Cir.2007). A review of the reports requested by counsel reveals several leads that would have prompted reasonable trial counsel to investigate further. If counsel had done so, they would have discovered extensive evidence that petitioner grew up in a deeply troubled, violent and deprived home.

The psychological reports submitted to the panel for consideration in mitigation— six reports in total—contained hints of petitioner's violent and deprived background. Dr. Schmidtgoessling's mitigation report noted that petitioner had a "rough childhood" and "an unhappy home life." (Supp. App., at 159). She reported that petitioner experienced a "lack of adequate food, clothing and material goods as well as [a] lack of close parental nurturance." (*Id.*). According to her report, petitioner felt "abandoned, angry, without significant stable relationships, and conscious of the need to defend himself in a dangerous, hostile environment." (*Id.* at 159–60). She relayed that petitioner was "on his own" at a young age, that he skipped school, and that he ran away for days at a time. Dr. Schmidtgoessling noted petitioner's history of depression and alcohol abuse. Likewise, Dr. Titchener reported that petitioner's mother was distant, that she frequently left her family, and that her abandonment was responsible for much of the anger and hostility petitioner experienced. (*Id.* at 165). Dr. Walters noted that petitioner's father was a "strict disciplinarian" and that the Sowell family was very poor. (*Id.* at 169). Walters, Schmidtgoessling, Titchener and Cooper all noted that alcohol and marijuana use contributed to that events leading up to the murder. Despite these indications of petitioner's troubled childhood, counsel did not investigate further.

Notwithstanding the morsels of evidence that were included in the reports, no additional information was sought or presented to the three-judge panel due to counsel's deficient investigation. Like the petitioner in *Hamblin,* counsel failed to discover and

present "substantial evidence of a childhood in which abuse, neglect, violence and hunger were common." 354 F.3d at 493. The Court is troubled that the panel did not learn that petitioner's life as a child was chaotic, violent and neglectful. The Court is troubled that the panel did not learn that petitioner's father was a raging alcoholic who physically abused his wife and children on a regular basis, that petitioner's parents regularly abandoned their children for three to four days at a time with no supervision, and that petitioner experienced poverty to such a degree that the Sowell children went without food and adequate clothing, had to beg for and steal food, and that petitioner's infant brother died of starvation. The Court is troubled that the panel was not aware that petitioner's father tied him to a chair and beat him until a neighbor intervened, that petitioner's sister was molested by their father, and that petitioner moved to a junkyard and lived, on his own, in a tent at the tender age of fourteen. The Court finds it significant that petitioner's siblings have not fared much better in their own lives, a likely result of growing up in the same environment as petitioner.

Not only do the affidavits that petitioner submitted in his state postconviction proceedings, and to which he refers herein, paint a more complete picture of petitioner, the information set forth in those affidavits is qualitatively different than the information that was presented during the mitigation hearing. In this respect, this case is different from *Campbell v. Coyle*, 260 F.3d 531 (6th Cir.2001). In *Campbell*, the Sixth Circuit rejected the petitioner's argument that his counsel were ineffective at the mitigation phase of his trial for failing to discover and present evidence that he suffered from post traumatic stress disorder ("PTSD") as a result of being severely burned in a fire at age four. Campbell argued that his counsel failed to investigate the medical records from when he was treated for burns as a child, and that if counsel had investigated those records, they would have discovered that he suffered from PTSD and they could have presented evidence of that disorder to the jury. *Id.* at 553. The Sixth Circuit concluded that Campbell could not establish deficient performance because "trial counsel engaged in an extensive investigation of Campbell's history and current mental state. They interviewed family members, had Campbell evaluated by a clinical psychologist, and consulted with two mitigation specialists." *Id.* Furthermore, although counsel did not take the extra step of presenting evidence of how the fire may have caused Campbell to suffer from PTSD, counsel did present evidence that Campbell had been the victim of a terrible fire as a child. The jury heard testimony from Campbell's sister, who was also a victim of that fire, concerning the effects of that childhood tragedy, and, importantly, Campbell's scars from that fire where plainly visible to the jury. *Id.* at 554. Stated differently, the fire, as well as the effect it had on petitioner and his sister, were *known* to the jury. In the instant case, to the contrary, Petitioner Sowell's tragic and violent childhood was unknown to the panel that sentenced him to death. Counsel not only failed to take the "extra step" of connecting petitioner's violent and deprived childhood to the commission of the instant offense, they failed to offer any evidence of that childhood, despite the availability and willingness of witnesses to so testify.

After considering the facts of this case with due regard to the deference that *Strickland* requires, the Court finds that counsel's investigation into petitioner's background did not reflect reasonable professional judgment. Counsel's failure to interview members of petitioner's family

was neither consistent with the professional standards that prevailed in 1983, nor reasonable in light of the evidence contained in the PSI and the psychological reports that would have led a reasonable attorney to investigate further. As in *Wiggins*, the information contained in those reports triggered an obligation to dig deeper, and counsel had sufficient information about Sowell's horrific childhood to render their failure to pursue further investigation professionally unreasonable. Counsel ignored known leads that might have helped them to prepare their case in mitigation, and the Court finds that the failure to investigate "resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526, 123 S.Ct. 2527.

This is not a case where counsel presented absolutely no evidence in mitigation. Counsel did present a case emphasizing the good in petitioner. The Court cannot conclude, however, that counsel's decision to emphasize the good rather than the bad was reasonable trial strategy, not because there was insufficient evidence to support that theory, but because there simply is no evidence that counsel were even aware of petitioner's troubled past because they did not sufficiently investigate petitioner's background. As Judge Cook reiterated in *Harries*, the "principal concern in deciding whether counsel exercised reasonable professional judgment is whether the investigation supporting counsel's decision not to introduce mitigation evidence of Harries's background *was itself reasonable*" (Emphasis in original) (quoting *Wiggins*, 539 U.S. at 522–23, 123 S.Ct. 2527). In this case, counsel were not in a position to elect to pursue one strategy over another because they had not reasonably investigated petitioner's background. Pursuing the leads regarding petitioner's background was necessary to making an informed choice regarding available mitigation strategies.

Furthermore, as will be discussed in further detail, a reasonable investigation would have revealed that the information concerning petitioner's background was not inconsistent with, and might actually have bolstered, counsel's mitigation theory.

#### b. prejudice

Pursuant to *Strickland*, the Court must also examine whether counsel's deficient performance prejudiced petitioner. Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner must demonstrate that "counsel's errors were serious enough to deprive [him] of a proceeding the result of which was reliable." *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir.1995). For the following reasons, the Court finds that counsel's failure to discover, develop and present the wealth of mitigating evidence concerning petitioner's traumatic background undermines confidence in the outcome of the sentencing phase of his trial. This Court is persuaded that a reasonable probability exists that the outcome would have been different had more detailed information been presented regarding petitioner's tragic childhood and social development, or had his attorneys utilized a mitigation specialist to compile and present a more comprehensive social history.

The mitigating evidence that counsel failed to discover and present here is powerful. Petitioner experienced severe deprivation, neglect, and physical and emotional abuse as a child. His parents were frequently absent, he and his siblings were malnourished and hungry, they lacked ade-

quate clothing and shoes, and were bitten by rats. Petitioner's younger brother died of starvation. When his parents divorced, petitioner was forced to live with his father who beat him. His father once tied him to a chair and beat him until a neighbor intervened. Petitioner suffered several head injuries as a child. When petitioner was only fourteen, he began living in a tent at a junkyard. Petitioner's "nightmarish childhood" was relevant to assessing his moral culpability and this Court must conclude that there is a reasonable probability that this powerful background information may have militated against the appropriateness of the death penalty. *See Williams v. Taylor*, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

The Court finds that petitioner's case is distinguishable from other cases in which the Sixth Circuit has found deficient performance but not prejudice. In *Slaughter v. Parker*, 450 F.3d 224 (6th Cir.2006), for example, the Sixth Circuit concluded that counsel's performance was deficient because counsel failed to investigate Slaughter's background and made no effort to locate his family. Had counsel done so, "the jury would have heard testimony from Slaughter's mother, brothers, and grandparents that Slaughter was abandoned by his father, abused by his mother and stepfather, and frequently left in charge of his siblings." *Id.* at 234–35. However, the Court determined that Slaughter could not establish the prejudice prong of the *Strickland* test because the additional information regarding Slaughter's background would have been cumulative of the evidence already admitted at trial, because "[t]he jury heard such testimony from Slaughter himself." *Id.*

In the instant matter, the additional information that was not discovered and presented would not have been merely cumulative of information that was presented.

The available mitigating evidence that petitioner's counsel failed to discover and present was significant, and qualitatively different from the information that the panel received. The information concerning petitioner's background would have painted an entirely different portrait of petitioner.

Nor is this a case where the information that counsel failed to develop and present would have been inconsistent with, or otherwise diminished, the mitigation theory that counsel did present. As noted above, counsel settled upon a mitigation theory that petitioner had good in him, and people who valued him. Counsel attempted to show that petitioner's life was worth sparing because he went out of his way to help others who were down on their luck even when he had little to give, that he was an exceptionally hard worker, and that he was a kindhearted person. The evidence concerning petitioner's horrific upbringing that counsel failed to present would have bolstered their mitigation case by demonstrating that petitioner was capable of generosity and good acts in spite of the upbringing that he endured.

*Johnson v. Bell*, 344 F.3d 567 (6th Cir. 2003), is another case where the Sixth Circuit found deficient performance but not prejudice. In *Johnson*, the Sixth Circuit concluded that the petitioner could not establish prejudice as a result of counsel's failure to interview members of his family because the information that was not presented would have only helped to humanize the petitioner by showing the jury that his family "loved and valued him, that he had been a good son, brother, and parent." *Id.* at 574. The Sixth Circuit held that "we cannot say that this testimony would likely have led to a different result because it is entirely possible, as the Tennessee Court of Criminal Appeals pointed out, that the jury could have concluded that

petitioner was even more culpable because he had enjoyed a loving family but had brutally murdered a wife who loved him." *Id.*

In Sowell's case, however, the testimony regarding his childhood could not have possibly made petitioner appear more culpable. Rather, the evidence, if discovered and presented, is of the type that might well have affected the panel's appraisal of his moral culpability. Petitioner's exposure to violence extended beyond the abuse that he suffered and permeated his childhood. His father beat his mother and the other children, and sexually abused petitioner's sister. Petitioner was forty-seven years old at the time of his trial. The evidence would have helped illustrate the manner in which Sowell's violent background contributed to his conduct and violent reaction to the theft that he perceived.

This is also not a case where counsel could have reasonably feared opening the door to negative information that the panel would not have otherwise learned about petitioner. The door was already opened by the information, including petitioner's entire criminal record and arrest history, that was included in the PSI and various mental health evaluations. In its sentencing opinion, the panel noted that petitioner's "life for the past thirty years has been one of chronic criminal behavior, much of its involving acts of violence." (Mitig. Tr., at 79). Yet, the panel did not hear any evidence of how violence was so very prevalent during the formative years of petitioner's life—evidence which may have explained why petitioner grew into the kind of adult who found himself frequently reacting in a violent manner. Evidence of petitioner's background would have helped explain petitioner's significant repressed rage, and had the panel been able to place petitioner's "excruciating life history on the mitigating side of the scale," there is a

reasonable probability that at least one member of the panel "would have struck a different balance." *Wiggins*, 539 U.S. at 537, 123 S.Ct. 2527.

For the foregoing reasons, the Court finds that given the nature and extent of the abuse and neglect that petitioner experienced as a child, there is a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing, and that a three-judge panel presented with this information would have returned a different sentence. Accordingly, the Court finds that petitioner is entitled to relief on his claim that his trial counsel provided ineffective assistance during the penalty phase of his capital trial due to their failure to conduct a constitutionally adequate investigation into his background and social history.

■ With respect to petitioner's final contention that his counsel were ineffective for requesting, and then not objecting to the admission of, a PSI, the Court concludes that his argument is without merit. Section 2929.03(D)(1) of the Ohio Revised Code requires that a presentence investigation report be prepared for the mitigation phase of a capital trial, but only upon the request of the defendant. That section further states that, should the defendant request the report, copies of the presentence investigation report must be provided to the defendant, the prosecutor, the trial judge and the jury, if the case was tried by a jury. The use of this procedure is often criticized. *See, e.g., Haliym v. Mitchell*, 492 F.3d 680, 717 (6th Cir.2007) (noting that "the obvious concern with requesting such an instrument is the lack of control which counsel has over the information which is made available to the trier of fact"). However, Ohio courts have held that it is not unconstitutional, and have consistently rejected the argument that attorneys are constitutionally ineffective for

utilizing it. *See, e.g., State v.McNeill,* 83 Ohio St.3d 438, 450–51, 700 N.E.2d 596 (1998) ("[I]t is not ineffective assistance to request a PSI where the record does not rebut the presumption that counsel acted reasonably."); *see also State v. Keith,* 79 Ohio St.3d 514, 684 N.E.2d 47, (1997); *State v. Esparza,* 39 Ohio St.3d 8, 9, 529 N.E.2d 192 (1988); *State v. Buell,* 22 Ohio St.3d 124, 138, 489 N.E.2d 795 (1986).

Furthermore, the cases that have criticized this procedure are relatively recent, and this Court must judge the reasonableness of counsel's conduct as of the time that counsel rendered the assistance. *Sowell v. Bradshaw,* 372 F.3d 821, 838 (6th Cir.2004) (finding that counsel's conduct with respect to petitioner's jury waiver did not fall below a minimal level of professional competency even though counsel "might now, over sixteen years later, approach the situation differently"). The decision to request a PSI or mental examination under R.C. § 2929.03(D)(1), so long as there was some reasoned basis for it, is generally a tactical decision not to be second-guessed in hindsight. Although it would appear that the better practice would have been for counsel to forgo requesting a PSI, the Court cannot conclude that, in 1983, counsel were constitutionally ineffective for utilizing § 2929.03(D)(1) of the Ohio Revised Code and requesting the preparation of a PSI.

### 2. *Necessary Experts*

■ Petitioner argues that counsel failed to retain reasonably necessary mitigation experts. First, petitioner argues that because his counsel failed to sufficiently investigate his background and social history, Drs. Schmidtgoessling and Cooper did not have all of the information necessary to conduct an adequate mitigation evaluation. Due to their lack of information, petitioner contends, the mitigation evaluations performed by Schmidtgoessling and Cooper, as well as the reports that were generated as a result of those evaluations, were constitutionally inadequate. Next, petitioner argues that counsel should have requested the appointment of additional, independent experts based on information contained in the reports generated by the court's experts. Specifically, petitioner claims that counsel should have requested a substance abuse or addiction specialist, and that counsel should have requested further testing by a neuropsychologist to determine whether he suffered from a brain impairment or brain damage.

Petitioner argues that he was substantially prejudiced by counsel's failure to retain reasonably necessary mental health experts. Because counsel did not follow up on the information contained in the reports submitted by the court's experts, and failed to request a neuropsychological evaluation of petitioner and a substance abuse specialist, the three-judge panel did not consider crucial psychological evidence that was necessary for the panel to draw a nexus between petitioner's background and the events that led up to his commission of the offense. Petitioner argues that a habeas petitioner proves prejudice when he demonstrates that trial counsel failed to present evidence of a brain impairment. *See Glenn,* 71 F.3d 1204, 1211 (6th Cir. 1995).

In support of his argument that the mitigation evaluations performed by Schmidtgoessling and Cooper were constitutionally inadequate due to counsel's failure to investigate his background and social history, petitioner cites an affidavit from Dr. Julia Hawgood, a psychologist who evaluated him in 1989 in connection with his state postconviction proceedings. Dr. Hawgood's affidavit detailed the importance of having complete background

information of a capitally charged defendant. As part of her evaluation of petitioner, Dr. Hawgood reviewed the transcript of the mitigation hearing, all of the affidavits submitted by petitioner in post-conviction, all psychiatric evaluations performed in his case, the PSI, all testing data, prison records, medical records, and parole progress reports, and conducted a six hour clinical interview of petitioner. (Hawgood Affidavit, Supp.App., at 225).

Dr. Hawgood opined that extensive psychological data, as well as records from schools, treatment sites, courts, and employers should have been available for counsel's preparation, and that this extensive data "should have been available to the mental health professions asked to do the psychological evaluation for mitigation, so that the unique developmental influences of Mr. Sowell's life and his resulting personality dynamics could be cohesively conceptualized and integrated into the presentence evaluation." (*Id.* at 244). With respect to Dr. Schmidtgoessling's mitigation evaluation, Dr. Hawgood determined that Dr. Schmidtgoessling "neither was given sufficient time to conduct an in-depth evaluation, nor was she provided with extensive collateral data from other professionals during this brief period." (*Id.*) Due to the lack of necessary data, Dr. Hawgood concluded, Dr. Schmidtgoessling was unable to provide a comprehensive picture of petitioner's development. (*Id.*). Dr. Hawgood found it noteworthy that Dr. Schmidtgoessling "was not called as an expert witness, so that her expertise as a professional and her knowledge of Mr. Sowell's developmental influences could be utilized to the fullest." (*Id.*). Dr. Hawgood offered the following opinion:

In short, in order for the legal process to work optimally, the psychologist and the trier of fact must have the opportunity to understand in depth who the defendant is, how his life's experiences have come to impact his functioning, and what psychological factors come to play in the crime. It is my opinion that neither Billy Joe Sowell's attorney nor his trier of fact had such a fully developed understanding.

(*Id.* at 245–46).

With respect to her own evaluation of petitioner, Dr. Hawgood attempted to explain petitioner's development in terms of biological and environmental influences. She noted that petitioner, during his formative years, developed an extreme sense of anger, inadequacy and longing for acceptance due to the lack of familial resources and nurturing by his parents. Petitioner felt "misused, emotionally abandoned, unappreciated, and victimized." (*Id.* at 229–30). From his parents, petitioner learned that an appropriate response to frustration was physical violence, even in personal relationships. (*Id.* at 232–33; Doc. # 180, at 25). Dr. Hawgood concluded that "[b]y the time of his capital offense in 1983, Billy Joe Sowell had developed a considerable repressed rage that stems originally from his sense of being emotionally and physically abandoned by his parents and from his resentment at being victimized by life." (Supp.App., at 236). Petitioner attempted to stringently over control his rage through "long, hard hours of structured labor," and by isolating himself from potential sources of frustration. (*Id.* at 237). Petitioner also suffered from "feelings of inferiority, inadequacy, and low self esteem," which he attempted to offset by being generous to others. (*Id.*). Petitioner used alcohol to reduce his anger, but "[i]ronically, alcohol would ameliorate his anger, but also reduce his ability to control his anger." (Doc. # 180, at 26).

Dr. Hawgood noted that on the day of the offense, "[p]sychologically, Mr. Sowell experienced himself in yet another situa-

tion of feeling intensely exploited, manipulated and unappreciated" because he believed that the occupants of the apartment had stolen his money while he slept off the effects of alcohol and marijuana. (Supp. App., at 243). His anger at being robbed "was based on the fact that he had been a 'good friend' to Mr. Graham by lending him money and helping him out." (Id.). More importantly, according to Dr. Hawgood, "the anger was fueled at a more primitive level by a lifetime of perceived unfair treatment, beginning the day he was born." (Id.).

Petitioner's argument that counsel were ineffective because they did not request additional mental health evaluations once they were informed that further evaluations were necessary has two sub-parts. First, petitioner argues that counsel should have requested the appointment of a substance abuse or addiction specialist. Petitioner directs the Court's attention to the reports of Drs. Titchener and Walters addressing the issue of sanity, which indicated that alcohol and marijuana impacted petitioner's development in life. (Titchener Insanity Report, Supp.App., at 165–66; Walters' Insanity Report, Supp.App., at 170). Additionally, the mitigation reports prepared by Drs. Cooper and Schmidtgoessling concluded that petitioner's usage of alcohol and marijuana contributed to the commission of the offense. (Cooper Mitigation Report, Supp.App. at 157; Schmidtgoessling Mitigation Report, Supp.App. at 161). Dr. Schmidtgoessling determined that there was a "high likelihood" that petitioner was an alcoholic. (Schmidtgoessling Mitigation Report, pg. 3, Supp. App. at 161). Petitioner argues that his counsel should have sought to further development this information, because "the reports that the court admitted at the mitigation phase should have placed counsel on notice as to the need to request the

appointment of a substance abuse or addiction specialist." (Doc. # 180, at 17).

In the second sub-part, petitioner claims that counsel should have requested the appointment of a neuropsychologist, as well as additional psychological testing to determine if petitioner was suffering from brain damage or a brain impairment. Petitioner directs the Court's attention to Dr. Cooper's report which stated that petitioner had suffered from "two previous psychiatric episodes...." (Supp.App., at 155). Dr. Titchener concluded in his sanity evaluation report that petitioner suffered from a "mental disease or defect which would interfere with his capacity at the time of the offense to act upon his awareness of the distinction between right and wrong." (Supp.App., at 166). Additionally, another report indicated that petitioner suffered severe head injuries as a child and suffered from blackout spells between the ages of eight and fourteen. (April 15, 1983 Reclassification Report, Mitigation Ex. 1, Supp.App. at 278). Petitioner claims that in light of this information, counsel should have sought an evaluation by a neuropsychologist to determine the extent of any brain impairment or brain damage suffered by petitioner.

Petitioner has offered affidavits from two additional mental health experts to support his claim that trial counsel failed to secure necessary experts and evaluations. First, petitioner offers an affidavit from Robert Smith, Ph.D., a licensed Clinical Psychologist, who, in 1993, conducted a psychological and chemical dependency assessment of petitioner in order to determine the nature, extent, and effect of petitioner's dependence on alcohol. (Supp. App., at 273). Dr. Smith administered the Michigan Alcoholic Screening Test ("MAST") and the Drug Abuse Screening Test ("DAST"). (Id.) Dr. Smith noted that on either of those tests, a score of five or

higher is significant. (*Id*) Petitioner received a score of 31 on the MAST, and a score of 8 on the DAST. (*Id.*) Dr. Smith concluded that petitioner's scores "clearly indicated that his use of drugs and alcohol was problematic." (*Id.*)

Dr. Smith noted that petitioner's father abused alcohol on an almost daily basis, and that two of petitioner's three brothers have an extensive history of alcohol abuse. (*Id.* at 274). Petitioner began experimenting with alcohol at age thirteen. (*Id.* at 274). By age fifteen, and after his parents decided to divorce, petitioner began to abuse alcohol on a daily basis. (*Id.*) When drinking alcohol, petitioner became short tempered and would initiate fights with his peers. (*Id.*). Between the ages of nineteen and twenty-one, petitioner's use of alcohol continued to be excessive, resulting in blackouts, mood swings, and angry outbursts that would lead to fights with those around him. (*Id.* at 275). Between the ages of twenty-two and thirty, petitioner spent considerable time incarcerated, where he learned to make homemade alcohol.

Dr. Smith characterized petitioner's alcohol abuse between the ages of thirty and forty as excessive. Smith described that time period as follows:

> Mr. Sowell recognized that his use of alcohol was out of control. He made several unsuccessful attempts to reduce his consumption. He was successful for only short periods of time and then would resume drinking in excessive amounts. The blackouts increased in frequency and his behavior became more erratic. After separating from his wife, his drinking progressed even further. At this point, Mr. Sowell acknowledged that when he attempted to quit drinking, he experienced severe withdrawal symptoms (i.e., gross tremors, diaphoresis, auditory and visual hallucinations). He realized that he could not stop drinking abruptly and needed to maintain his consumption in order to avoid becoming ill.

(*Id.*). According to Smith, petitioner reported gulping alcohol and admitted that he had frequent blackouts. (*Id.* at 275). Petitioner's use of alcohol "progressed to the point of what is referred to as 'maintenance drinking' in which the individual maintains a blood alcohol concentration that will enable them to avoid the experience of any withdrawal." (*Id.* at 276).

Dr. Smith explained that the most notable sign of an individual suffering from alcoholism is a change in the person's behavior, and "[d]ramatic mood swings are common and may lead to bouts of depression or unpredictable acts of violence." (*Id.* at 276). With respect to petitioner's interpersonal relationships, Dr. Smith reported that petitioner acknowledged that his use of alcohol led to arguments with his family and peers as early as adolescence. As an adult, petitioner's alcoholism caused his relationships with friends and family, including his wife, to deteriorate. (*Id.* at 276).

Dr. Smith concluded that petitioner's behavior and judgment were significantly influenced by his extensive use of alcohol throughout the day of the offense. Specifically, Dr. Smith noted that petitioner's violent behavior was directly affected by his alcohol use, and "[t]here is reason to believe that had he not been under the influence of alcohol, he would have been able to refrain from his involvement in this offense." (*Id.* at 278). Dr. Smith opined that "[g]iven Mr. Sowell's history of alcohol abuse, and the significant life problems he has experienced as a result, the evidence is overwhelming that he suffers from a psychiatric disorder titled, Alcohol Dependence (DSM III–R 303.90) and Cannabis Abuse (DSM III–R 305.20)." (*Id.*).

Petitioner has also submitted an affidavit from Dr. Michael Gelbort, a licensed clinical neuropsychologist, who evaluated him in 1993.[2] Dr. Gelbort explained that petitioner is slow to process and perceive information, is easily confused, and his thought processes are often "illogical and tangential." (Supp.App., at 220). Petitioner's academic skills are at the fourth, eighth and sixth grade levels for the areas of reading, spelling and math respectively. (*Id.*) Dr. Gelbort determined petitioner's full scale IQ to be 86. (*Id.* at 221). On the Wechsler Adult Intelligence Test, he scored in the lower two and one half percent of the population on the subtests involving verbal comprehension, verbal reasoning, and verbal problem solving. (*Id.* at 151). Petitioner scored in the lower two percent of the population in his ability to "reason, ponder, project into the future, anticipate consequences of all those things . . . ." (*Id.* at 152). Petitioner exercises thinking skills, like those where he must use judgment and reasoning, "like people who tire mentally retarded." (*Id.* at 152). Dr. Gelbort testified at the evidentiary hearing that petitioner tested "like people with brain damage, and that's in fact consistent with his history. He has had a number of head injuries." (Fed. Evid. Hearing Tr., at 84). Dr. Gelbort noted in his affidavit that petitioner suffered head injuries as a youth that resulted in losses of consciousness on several occasions. Those injuries arose from fights, and from going down a ski jump and crashing on a bicycle. (Supp.App., at 219).

Dr. Gelbort concluded that petitioner's slowed information processing ability, and his limitations in problem solving abilities, are consistent with the late effects of acquired brain dysfunction, which affects the frontal and left temporal lobes of the brain. (*Id.* at 222). Due to organic dysfunction, petitioner is more likely to be impulsive, to process information slowly, to have difficulty problem solving and working in a logical manner. (*Id.* at 222–23). All of these problems "are exacerbated by the effects of chronic alcohol abuse." (*Id.* at 222). Dr. Gelbort concluded that "Mr. Sowell's cognitive condition appears to be of long-standing and would have been in effect at the time of the criminal act in question." (*Id.* at 223). With respect to the prior evaluations of petitioner, Dr. Gelbort opined that "[t]he patient's history has several markers which would have alerted an appropriately trained psychologist from that era that neuropsychological dysfunction might be present and should be evaluated." (*Id.* at 223).

The question before the Court is whether petitioner's trial attorneys performed unreasonably and to petitioner's prejudice in failing to request and obtain independent experts regarding petitioner's brain impairment and substance abuse, and choosing instead to rely on the evaluations and reports prepared by the court's experts. In support of this claim, petitioner submits affidavits from three doctors who concluded, after reviewing the evidence in his case, as well as substantial background information, that petitioner's alcoholism directly affected his behavior on the night that he killed Graham, and that the reports prepared by Drs. Cooper and Schmidtgoessling were inadequate. Petitioner argues that these affidavits offer proof of what any other experts would have offered, and that, potentially, the experts in his case would have offered had they been provided with more developed

---

2. Dr. Gelbort also testified before this Court in the evidentiary hearing conducted on April 21, 1999. His testimony was limited to whether petitioner understood his rights when he waived his right to a trial by jury.

information concerning petitioner's background.

As an initial matter, the Court notes that it has previously concluded that it could not consider the affidavits of Drs. Smith and Gelbort. In his state postconviction proceedings, petitioner presented an affidavit from Dr. Hawgood, but did not present affidavits from Smith or Gelbort. The Court concluded, in its Opinion and Order denying petitioner's motion for an evidentiary hearing on this claim, that petitioner failed to explain, and that no explanation was apparent from the record, why this evidence could not have been presented to, and developed in, the state courts during his postconviction proceedings. (Doc. # 123 at 19, *Opinion and Order* of September 29, 1998). The Court also concluded that petitioner failed to demonstrate that a fundamental miscarriage of justice would result if the Court denied petitioner's motion for an evidentiary hearing in this regard. (*Id.*) However, even if the Court considered all three affidavits, petitioner's arguments lack merit.

■ With respect to the failure of petitioner's trial counsel to obtain their own independent psychological experts, counsel did not perform unreasonably or to petitioner's prejudice in this regard. Petitioner's ineffectiveness allegation is also related to the fact that, by virtue of trial counsel's failure to obtain their own experts, the results of the various psychological evaluations that were performed on petitioner were available to the prosecution and trial court alike. Petitioner asserts that the failure of his attorneys to secure their own experts was not the result of sound trial strategy. However, petitioner offers no evidence to the contrary, and counsel are not ineffective simply for using a court expert, as opposed to an independent expert. *Keith v. Mitchell,* 455 F.3d 662 (6th Cir.2006) (rejecting argu-

ment that counsel were ineffective for using court's experts when he could not demonstrate prejudice); *Smith v. Mitchell,* 348 F.3d 177 (6th Cir.2003) (same).

Moreover, Counsel's decision in this instance not to obtain additional substance abuse or psychological experts can be characterized as a reasonable decision deserving of deference because it appears that counsel had available to them multiple evaluations of petitioner concerning his competency and mental state. Through the pretrial period, petitioner was evaluated on several occasions by multiple mental health experts concerning both his competency to stand trial and his mental state at the time of the offense. Based on the presumption of competency that defense counsel enjoy under *Strickland,* as well as the record, it is reasonable to presume that counsel's decision not to seek yet another expert stemmed not from neglect or laziness, but from the reasonable decision, based on the conclusions of the multiple doctors who had examined petitioner prior to trial, that the well was dry. *See Jermyn v. Horn,* 266 F.3d 257, 301–302 (3rd Cir.2001) (finding that counsel's decision not to seek another mental health evaluation was reasonable based on contents of report finding that defendant was competent); *Wilson v. Greene,* 155 F.3d 396, 403 (4th Cir.1998) (counsel not required to second-guess content of reports concluding that defendant was not mentally ill at time of the offense). Counsel could reasonably have determined that there was no more information to be gleaned and no advantage to be gained by obtaining their own experts. For these reasons, petitioner's counsel did not perform unreasonably or to petitioner's prejudice in this regard.

Petitioner is incorrect in his contention that none of the experts who evaluated him at the time of his trial drew a connection between his alcoholism and the mur-

der of Graham. Contrary to petitioner's assertion, Dr. Schmidtgoessling did conclude that petitioner was an alcoholic, and the reports of Drs. Titchener and Walters contained information about the effect of alcohol on petitioner's commission of this offense. Dr. Schmidtgoessling noted that the MMPI testing, which she described as highly accurate at separating alcoholics from non-alcoholics, indicated that petitioner was an alcoholic. (Supp.App., at 160). Dr. Schmidtgoessling recited petitioner's history of excessive drinking, and noted that petitioner suffered alcoholic blackouts and was prone to binge drinking. (*Id*). She opined that there was a high likelihood that petitioner suffered from alcoholism. (*Id.* at 161).

Petitioner's history of alcoholism was also referenced in the other evaluations of petitioner that were included in Court's Exhibit 1 and submitted for the panel's consideration in mitigation. Dr. Walters, who evaluated petitioner to determine his mental state at the time of the offense, noted that petitioner's potential for being hurt by others is magnified, significantly, when he has been drinking alcohol. (Supp. App., at 170). Dr. Walters concluded that petitioner's anger and feelings of inferiority are "severely exaggerated when he is under the effects of alcohol, which was the case on the day of the alleged offense. Any impairment in ability to refrain from the alleged behavior was due to a lethal combination of character style and alcohol." (*Id.*). Dr. Cooper, a psychiatrist, determined that petitioner's use of alcohol and marijuana "at levels which seriously impair rational thinking, judgment and impulse control," contributed to the commission of the offense. (Supp.App., at 157). Likewise, Dr. Titchener, in his report regarding petitioner's competency to stand trial, noted that petitioner's consumption of "alcohol and marijuana were responsible for the loss of control which this man

usually very carefully maintains." (Supp. App., at 166).

The fact that counsel did not request the appointment of a substance abuse specialist more likely suggests that counsel felt Dr. Schmidtgoessling's diagnosis of petitioner, and the nexus that she and the other experts drew between his alcoholism and his conduct on the night in question, sufficiently addressed this issue. Counsel may have felt that the conclusion of Dr. Schmidtgoessling that petitioner was an alcoholic would carry more weight than that of a defense expert, due to the fact that Dr. Schmidtgoessling was an independent court expert. Thus, it could very well have been a strategic decision on the part of defense counsel to rely exclusively on the conclusions reached by the court's own experts. In any event, petitioner has failed to overcome the strong presumption that counsel's conduct in this regard was sound trial strategy and within the scope of reasonably professional assistance.

With respect to petitioner's claim that the experts failed to diagnose his brain impairment, petitioner has not demonstrated that he in fact suffers from a brain impairment. Petitioner's only evidence in this regard is Dr. Gelbort's affidavit, which this Court has determined it cannot consider. (Doc. # 123 at 19, Opinion and Order of September 29.1998). Even if the Court were to consider the affidavit of Dr. Gelbort, the Court is not of the view that Dr. Gelbort conclusively diagnosed petitioner as suffering from a brain impairment. Rather, Dr. Gelbort concluded that petitioner's slowed information processing ability and limitations in problem solving abilities was *consistent* with acquired brain dysfunction. (Gelbort Affidavit, Supp. App., at 222).

Even if petitioner's counsel had been deficient in not obtaining a defense expert

on substance abuse or a neuropsychologist, petitioner would be hard pressed to demonstrate prejudice. All three affidavits submitted by petitioner are lengthy and extraordinarily detailed, but their significance for the purpose of this habeas action is rather straightforward: All three conclude, among other things, that petitioner's intoxication played a role in the murder of Graham, and that petitioner may be suffering from a brain impairment. This information was, in essence, presented to the panel. Under *Strickland,* the Court must consider whether the additional evidence is so different in strength and character from what counsel presented that there is a reasonable probability that the inclusion of it would have affected the outcome of the trial. In so doing, the Court is not persuaded that this is a case where counsel failed to present evidence of mental or personality defects that almost surely would have mitigated petitioner's culpability and without which the Court cannot have confidence in the reliability of petitioner's sentencing proceedings. Accordingly, the Court concludes that counsel did not fail to retain necessary experts.

### 3. *Conclusion*

For all of the foregoing reasons, the Court grants in part and denies in part petitioner's claims of ineffective assistance of counsel during the mitigation phase of his trial. The Court finds that trial counsel failed to conduct an adequate sentencing phase investigation into petitioner's background and social history, and that petitioner has demonstrated a reasonable probability that at least one member of the three-judge panel would have voted against death had counsel presented mitigating evidence describing petitioner's violent and neglectful childhood. However, the Court finds petitioner's argument that

his counsel failed to obtain reasonably necessary experts to be without merit.

### ARGUMENT NO. II: THE ACTS AND OMISSIONS OF THE DEFENSE COUNSEL IN THE TRIAL PHASE DEPRIVED MR. SOWELL OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.[3]

In his second argument, petitioner asserts that he was denied his right to the effective assistance of counsel during the guilt phase of his trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Petitioner presents three arguments in support of this claim. First, petitioner argues that counsel failed to conduct a reasonable pre-trial investigation. Next, petitioner argues that counsel failed to cross-examine Donna Edwards, a key prosecution witness and eye-witness to the shootings. Finally, petitioner claims that counsel failed to object to inadmissible evidence concerning petitioner's children, a false ceiling in his apartment, and his prior contacts with law enforcement.

### A. Counsel conducted an unreasonable investigation

Petitioner argues that his counsel violated their duty to conduct a sufficient pre-trial investigation. According to petitioner, the ABA Standards for Criminal Justice require that defense counsel conduct a reasonable pre-trial investigation that includes, at a minimum, interviewing the state's witnesses, as well as identifying and interviewing any potential defense witnesses. Petitioner argues that the state provided his counsel with a witness list identifying twenty-two potential witnesses, two of whom actually witnessed the shootings, yet his counsel failed to interview any of those individuals prior to trial. In sup-

---

**3.** This Argument includes the Fifth Ground for Relief. (Petition, doc.# 9, ¶¶ 219–230).

port of this assertion, petitioner cites the affidavits of Jerrell Perrin and Donna Edwards, who aver that defense counsel never interviewed them. (Perrin Affidavit, Supp.App. at 264; Edwards Affidavit, Supp.App. at 211). Additionally, petitioner cites the itemized legal bills submitted by trial counsel, and argues that those bills do not reflect any attempt by counsel to interview any of the eyewitnesses. (Faller Fee Application, Supp.App. at 207–210). Because his counsel failed to conduct any pretrial interviews of the state's potential witnesses, petitioner argues, "defense counsel could not have possibly made adequate strategic and informed decisions regarding the presentation of the evidence." (Doc. # 180, at 35).

Petitioner asserts that he suffered prejudice as a result of counsel's failure to conduct an adequate pre-trial investigation. First, petitioner claims that because counsel did not fully investigate his case, they were ill-equipped to advise him to waive his right to a jury trial. Petitioner argues that counsel advised him to have his case decided by a three-judge panel, rather than a jury, without taking adequate precautions to ensure that a jury waiver would result in a sentence less than death. As a result, petitioner's "chances for success on appeal were diminished." (Doc. # 180, at 38). Petitioner's argument appears to ignore the decision of the Sixth Circuit addressing this issue. In its Opinion and Order of June 23, 2004, the Sixth Circuit rejected this argument, finding that "[a]lthough [Attorney] Pinales might now, over sixteen years later, approach the situation differently, his actions on the record of this case, concerning his advice to Sowell regarding the jury waiver, did not fall below a minimal level of professional competency, and thus did not constitute ineffective assistance of counsel." *Sowell v. Bradshaw*, 372 F.3d 821, 838 (6th Cir.

2004). Accordingly, the Court need not address this issue.

Next, petitioner claims that counsel's failure to identify Perrin as a potential witness resulted in prejudice because counsel were unaware that she had information that supported the defense theory of the case. Specifically, Perrin, who lived in the apartment building where the shooting occurred, heard "a heated, passionate, and emotional exchange between Mr. Sowell and Ms. Billups" immediately prior to the shootings. (Perrin Affidavit, Supp. App. at 263–264). Perrin would have testified that petitioner accused Billups of theft, and Billups verbally attacked petitioner with profanity. (*Id.*) Perrin knew Billups, and knew that Billups had a reputation as a prostitute who would "do a trick, wait until the 'John' fell asleep, and then steal from him." (Doc. # 180, at 41). According to petitioner, it is reasonable to conclude that he would have been convicted of an offense less than capital murder but for the deficient investigation by his trial counsel, because Perrin's account of the shooting is "strong support that Mr. Sowell's crime was one of sudden emotion, not studied and careful analysis." (*Id.*). Petitioner maintains that counsel should have called Perrin as a witness in order "to show that the shootings were prefaced by a heated, passionate, and emotional exchange between Mr. Sowell and Ms. Billups." (*Id.*) This testimony, petitioner contends, would have provided "additional facts to place a key element of the prosecution's case—prior calculation and design—in doubt." (*Id.*).

Petitioner presented this argument in his state post-conviction proceedings as part of his twenty-seventh cause of action. In support of this claim, petitioner presented the affidavit of an attorney expert who attested to a defense counsel's duties to a capitally charged defendant. Addi-

tionally, petitioner offered the affidavit of Jerrell Perrin, which stated that she was never contacted by petitioner's trial counsel or their investigators. The court of appeals rejected petitioner's claim on the merits, finding that the affidavit of the attorney expert expressed no opinion as to the performance of petitioner's own counsel, and finding that Perrin's proposed testimony, in substance, would have been cumulative of the evidence already presented at petitioner's trial. *State v. Sowell,* 73 Ohio App.3d 672, 680, 598 N.E.2d 136 (1st Dist.1991).

■ The failure to investigate or call a particular witness can constitute ineffective assistance of counsel in violation of the Sixth Amendment. *See, e.g., Clinkscale v. Carter,* 375 F.3d 430, 443 (6th Cir.2004) (collecting cases). But cases in which courts have found ineffective assistance under those circumstances involved not only a complete failure on the part of counsel to investigate the witness, or explain the failure to investigate, but also a showing that the witness or witnesses whom counsel failed to investigate did, in fact, have favorable testimony to offer. *See Stewart v. Wolfenbarger,* 468 F.3d 338, 356–57 (6th Cir.2006); *Towns v. Smith,* 395 F.3d 251, 258–59 (6th Cir.2005); *Clinkscale,* 375 F.3d at 443.

■ In the instant matter, the record does not support petitioner's contention that his counsel conducted a deficient investigation with respect to the culpability stage of his trial. To the contrary, the record reflects that counsel filed for discovery and for a more definite bill of particulars, met with petitioner to discuss his options with respect to the trier of fact, and reviewed the grand jury testimony of at least four witnesses. During a pre-trial hearing, petitioner's counsel stated on the record that they had met with the prosecutor and reviewed the evidence and photographs. (Tr. Trans. at 43). Counsel filed several pre-trial motions, including a motion to suppress the gun found in petitioner's apartment. Moreover, as the trial court noted, petitioner failed to present any evidence during his post-conviction proceedings suggesting that his counsel did not have copies of the witness statements to police. Accordingly, the record does not support petitioner's contention that his counsel were deficient due to a lack of preparation. *See, e.g., Mason v. Mitchell,* 320 F.3d 604, 618 (6th Cir.2003) (totality of circumstances did not demonstrate that counsel were unprepared where counsel filed numerous pretrial motions, argued several pretrial hearings, and clearly articulated defense theory to jury).

■ Furthermore, under *Strickland,* a court deciding an ineffective assistance claim need not address both components of the inquiry if the petitioner makes an insufficient showing on one. *Sowell v. Bradshaw,* 372 F.3d 821, 838 (6th Cir.2004) (citing *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052). Even if the Court were to assume that counsel's failure to interview the individuals on the state's witness list constituted deficient performance, petitioner cannot establish that trial counsel's failure to interview the witnesses, and specifically counsel's failure to call Perrin as a defense witness, affected the outcome of his trial.

The state listed Jerrell Perrin as a potential witness on its witness list, but she was not called to testify at petitioner's trial. During petitioner's postconviction proceedings, Perrin signed an affidavit stating that she knew Billups to be a prostitute with a reputation for "dishonesty because she rolled her male customers." (Perrin Affidavit, Supp.App. at 263–264). Further, Perrin's affidavit states, in relevant part:

4) Billy would help those individuals who were in a financial bind. As a result it was well known in our neighborhood that he carried money,

. . .

8) On the night in question I heard a ruckus in the hall. I looked in the hall and Billy was standing outside Calvin's apartment. I heard Billy ask for his money back. I also heard Pam Billups in a very loud voice shouting at Billy. She was using extreme profanity.

9) I shut my door hoping that the noise would cease. Twenty (20) to thirty (30) minutes later I thought I heard a car backfire. I opened my door and saw Billy walking back to the apartment.

. . .

12) I was not contacted by any of Billy's trial attorneys or their investigators.

(*Id.*)

In reviewing the entire trial record, the Court finds that the Perrin affidavit supports, in many respects, the state's theory of the case, and contradicts petitioner's account of the events of May 4, 1983. The information concerning Billups reputation as a prostitute who "rolled" her customers is not inconsistent with the trial testimony. Billups admitted during her direct testimony that she had just been released from the Cincinnatti Correctional Institute after having served time for petty theft. (Tr. Trans. at 193). Moreover, the portion of the Perrin affidavit that states that petitioner was arguing with Billups contradicts petitioner's testimony at trial, and supports the testimony of Billups and Edwards. Petitioner testified that he spoke to Graham about the fact that his money was missing, but that he did not confront Billups or Edwards. (*Id.* at 435). Billups, on the other hand, testified that petitioner "went off," was angry because she had not spoken to him earlier in the day, accused

her of stealing from him, and called her derogatory names. (*Id.* at 168–69). Edwards testified that petitioner and Billups had a "heated conversation" and that petitioner threatened to cut Billups' throat and to shoot her if she did not return the money to him. (*Id.* at 258–59). Furthermore, Perrin's statement that she heard what she thought was a car backfiring twenty or thirty minutes after the argument directly contradicts petitioner's testimony at trial that the time frame between the argument and the shootings was "far less than five minutes." (*Id.* at 439, 469).

Additionally, the Court must consider the strength of the evidence against petitioner in determining whether the alleged deficient performance prejudiced the outcome of the case. Identity was not an issue in this case, because petitioner admitted to shooting Graham to death, and shooting Billups three times. The only issue to be decided by the panel was whether petitioner committed the acts with prior calculation and design. The defense theory of the case was that petitioner did not, and that he was guilty of a lesser offense than aggravated murder. However, the state presented testimony from two individuals who were present in the apartment that day, both of whom actually witnessed the shootings. Petitioner stated in unmistakable terms his intention to retrieve his gun and shoot and kill Billups. The evidence against petitioner was great, and it is fair to say that the testimony of Perrin, who was not present in the apartment at the time of the shootings, would not have affected the outcome of petitioner's trial. Accordingly, the Court finds petitioner's claim to be without merit.

**B. Counsel failed to cross-examine Donna Edwards**

Petitioner argues that trial counsel performed deficiently because they failed to

cross-examine Donna Edwards, a key prosecution witness and eyewitness to the shooting. Petitioner maintains that the testimony of Edwards, who was the only individual present in the apartment who was not shot by petitioner, was inconsistent in several respects with the testimony of Pamela Billups, one of the victims of this offense. Petitioner highlights several of these inconsistencies. First, Billups testified that when petitioner entered the apartment, Graham, Billups and Edwards were eating, yet Edwards testified that when petitioner entered the apartment, Graham was at the store. (Doc. # 180, at 40). Next, Billups testified that she was not smoking marijuana, and Edwards testified that Billups and petitioner each had their own marijuana cigarette. (*Id.*). Third, Billups testified that petitioner did not threaten to cut her throat with a knife, and Edwards testified that petitioner did threaten Billups with a knife. (*Id.*). Fourth, Billups testified that. petitioner found her hiding in the closet prior to shooting Graham, and Edwards testified that petitioner shot Graham and then found Billups in the closet. (*Id.*) Next, Billups testified that she did not admit to taking petitioner's money prior to the shootings, yet Edwards testified that Billups confessed to stealing petitioner's money. (*Id.*). Finally, Billups testified that Edwards did not return to the apartment after the shootings, and Edwards testified that she did return to the apartment because when she went to get help, petitioner threatened to shoot her if she did not return to the apartment.

According to petitioner, trial counsel's failure to cross-examine Edwards concerning the above inconsistencies constituted deficient performance, and he suffered prejudice as a result. Specifically, petitioner argues that the three-judge panel believed the testimony of Billups and Edwards over the testimony of petitioner, as evidenced by the fact that the panel convicted Sowell of aggravated murder as opposed to manslaughter. Had counsel cross-examined Edwards and highlighted the inconsistencies between her testimony and the testimony of Billups, petitioner argues, the three-judge panel may have believed petitioner's version of the events. Petitioner maintains that cross-examination of Edwards was necessary to cast doubt as to the truthfulness of her testimony and the testimony of Billups.

Petitioner, who was represented on direct appeal by one of his trial counsel, raised this claim of ineffective assistance of counsel in his state postconviction petition as his twenty-seventh ground for relief The state courts refused to consider the merits of this claim, finding that it should have been raised on direct appeal and was therefore barred by *res judicata*. In this Court's *Opinion and Order* of March 16, 1999, (doc. # 134), the Court agreed, and determined that petitioner's claims of ineffective assistance of trial counsel should have been raised on direct appeal, even though one of his trial counsel remained on the case, because he had one new appellate lawyer who had not served as trial counsel. As will be discussed more fully in the section of this *Opinion and Order* addressing petitioner's fourth argument, that decision was incorrect in light of the Sixth Circuit's decision in *Combs v. Coyle*, 205 F.3d 269, 276–77 (6th Cir.2000). Accordingly, petitioner's claim of ineffective assistance of trial counsel for failing to cross-examine Donna Edwards is properly before the Court for a consideration on the merits.

 In determining whether trial counsel's performance fell below an objective standard of reasonableness, this Court must judge the reasonableness of counsel's conduct on the facts of petitioner's case,

viewed from counsel's perspective at the time, recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Strategic choices of counsel are entitled to deference, and the cross-examination of witnesses falls within the area of tactics or strategy that ought not be subjected to second-guessing merely because that particular strategy proved to be unsuccessful. That is, "[c]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel," and tactical decisions are not ineffective assistance of counsel simply because, in retrospect, "better tactics may have been available." *Jackson v. Bradshaw*, 2007 WL 2890388, \*25 (S.D.Oh. Sept.28, 2007) (citing *Dell v. Straub*, 194 F.Supp.2d 629, 651 (E.D.Mich.2002)).

Petitioner cites *Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir.2006), as support for his claim that counsel were ineffective for failing to cross-examine Edwards. *Higgins*, however, is readily distinguishable from petitioner's case. In *Higgins*, trial counsel failed to cross-examine Wayne Young, a witness whom the Sixth Circuit characterized as "the sole eyewitness to— and possible perpetrator of—the murder" with which Higgins had been charged. *Id.* at 632. At trial, counsel "candidly admitted that he was not prepared to go forward, and when his request for more preparation time was denied, he blithely forfeited his client's right to confront Wayne Young and subject his direct testimony to cross-examination." *Id.* The Sixth Circuit concluded that "[t]he failure of counsel to participate in a critical phase of the trial, and to subject the State's case to meaningful adversarial testing, *on the sole ground of lack of preparation*, was not a reasonable strategic decision entitled

to deference." *Id.* at 632–63 (citation omitted) (emphasis added). In petitioner's case, on the other hand, there is no reason to believe that counsel's decision to forego cross-examining Edwards stemmed from lack of preparation, or was based on anything other than trial strategy. Importantly, unlike the situation in *Higgins*, Edwards was never a potential suspect in this case, and the identity of the shooter was never in question.

Petitioner's case more closely resembles the case of *Moss v. Hofbauer*, 286 F.3d 851 (6th Cir.2002). In that case, the Sixth Circuit held that the petitioner could not prevail on his claim of ineffective assistance of trial counsel, because "counsel did not 'entirely fail to subject the prosecution's case to meaningful adversarial testing.'" *Id.* at 865 (quoting *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Although counsel in *Moss* waived opening statement and elected not to cross-examine a state's witness, the Sixth Circuit noted that counsel's preparation included "meeting with Moss before the preliminary examination, attending the preliminary examination, visiting Moss several times in jail, consulting with the attorneys for [co-defendants], visiting the scene of the shooting, and reviewing the records from the police department, which she obtained after drafting a discovery order." *Id.* at 861. Additionally, counsel "encouraged Moss to accept the guilty plea offer that the State had presented to him," and during the trial, counsel "reserved her right to make an opening statement, cross-examined several witnesses, and made a closing argument." *Id.*

After reviewing the record in its entirety, the Court finds that petitioner's claim of ineffective assistance of trial counsel lacks merit. Although Edwards was a witness to the actual shooting, she had little

to offer regarding petitioner's interaction with Billups in the days immediately preceding the shooting. Billups, on the other hand, was subject to lengthy cross-examination by counsel, as counsel attempted to establish that the shootings "were prefaced by a heated, passionate, and emotional exchange between Mr. Sowell and Ms. Billups." (Doc. # 180, at 41). Petitioner's case was not won or lost by whether counsel could exonerate him as the shooter; rather, counsel's theory of the case was that petitioner did not act with prior calculation and design, and "[t]he disputed issue centered on what precipitated the shooting." (Doc. # 186, at 7). To that end, counsel delivered an opening statement setting forth a cohesive defense, cross-examined Billups regarding the alleged theft that was at the center of the dispute, and called petitioner to testify regarding the events in question, his relationship with Billups in the days leading up to the shooting, and his mental state at the time of the offense.

Furthermore, the failure to cross-examine Edwards cannot be said to have affected the outcome of petitioner's trial. Even if counsel would have highlighted the inconsistencies between Edwards' testimony and that of Billups, those inconsistencies concerned somewhat collateral matters. What remains consistent with respect to the testimony of the two women is that petitioner threatened to shoot Billups, left the apartment to retrieve a gun from his own apartment down the hall, enlisted the assistance of Lenora Waugh to regain entry into the apartment, entered the apartment with force, shot Graham twice—including a fatal close range shot to his head, then went to where Billups was hiding in a closet and fired three shots into her body at close range, stopping only when he ran out of ammunition. With respect to these essential facts, the testimony of Edwards and Billups was consistent, and petitioner cannot meet the prejudice prong of *Strickland.*

## C. Counsel failed to object to inadmissible evidence

Finally, petitioner argues that trial counsel's performance was deficient during the guilt phase because counsel failed to object to inadmissible evidence. Petitioner claims that counsel failed to object to questions by the prosecutor during his cross-examination of petitioner concerning whether petitioner conceived children out of wedlock, had a "false" ceiling in his apartment, and whether petitioner had prior contacts with the Cincinnati Police Department. (Doc. # 180, at 37). Petitioner contends that he suffered prejudiced as a result of this line of questioning because neither the questions nor the answers were relevant to the charges contained in the indictment. According to petitioner, counsel's failure to object to this testimony permitted the prosecutor to portray petitioner as "immoral and violent." (*Id.*).

Respondent contends that petitioner has never presented this claim to the state courts, and therefore, the claim is procedurally defaulted and not preserved for habeas review. This Court agrees. Because petitioner was represented on direct appeal by one of his trial counsel, petitioner's ineffective assistance of trial counsel claims were properly raised in post-conviction. In his twenty-seventh ground for relief in his state post-conviction petition, petitioner set forth several allegations of ineffective assistance of trial counsel. (J.A. Vol. II, Ex. L to Return of Writ). As indicated by respondent, however, petitioner did not raise the instant ineffective assistance of trial counsel sub-claim in his petition for post-conviction relief. With respect to counsel's failure to object during the state's cross-examination of petitioner, petitioner argued that his counsel should

have objected to the prosecutor's attempt to use petitioner's silence against him. (*Id.* at ¶ 164). Petitioner did not allege that counsel should have objected to the prosecutor's questions regarding petitioner's children, the alleged false ceiling, or his prior contacts with law enforcement. Petitioner has never presented those claims to the state courts.

 When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state court remedies were still available or due to a state procedural rule that prevented the state courts from reaching the merits of the claim, that claim is procedurally defaulted. *See Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir.2000). A federal court will review a defaulted claim only if a petitioner "show[s] that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default." *Id.* at 550. Petitioner has not attempted to make such a showing here. Petitioner, having offered no explanation as to why the claim was not raised in the state courts when it could and should have been, has procedurally defaulted this sub-claim and it is not amenable to habeas corpus review.

Even if this sub-claim was not defaulted, it is without merit. Petitioner simply cannot establish that he suffered prejudice as a result of trial counsel's failure to object to questioning by the prosecutor concerning whether he conceived children out of wedlock, whether he had a false ceiling in his apartment, or whether he had prior contacts with the Cincinnati Police Department. "In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera*, 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (per curiam); *see also Smith v. Mitchell*, 348 F.3d 177, 206 (6th Cir.2003) (because argument was made to a three-judge panel any inflammatory effect was "de minimis"); *Wickline v. Mitchell*, 319 F.3d 813, 823–24 (6th Cir.2003) (holding that the three-judge panel would not likely have been mislead by any improper evidence). Petitioner fails to direct this Court's attention to any evidence suggesting that the three-judge panel actually considered any of the issues to which he complains his counsel should have objected, and accordingly, petitioner cannot satisfy the prejudice prong of the *Strickland* test.

***ARGUMENT NO. III:* THE TRIAL COURT FAILED TO PROVIDE MR. SOWELL WITH REASONABLE AND NECESSARY EXPERTS FOR THE MITIGATION PHASE.[4]**

In his third argument, petitioner claims that the trial court deprived him of due process by failing to appoint necessary experts for the mitigation phase of his trial. Petitioner argues that the evaluations of Dr. Schmidtgoessling, a Clinical Psychologist, and Dr. Cooper, a psychiatrist, were deficient because they were based on an inadequate investigation into petitioner's social history, and because the experts were not qualified to perform certain tests. Specifically, petitioner complains that neither expert provided any meaningful analysis as to his childhood development and the manner that his development impacted the commission of the offense, neither expert diagnosed his alcoholism with any certainty, and neither expert addressed whether petitioner suffered

---

4. This Argument includes the Twenty–Sixth Ground for Relief. (Petition, doc.# 9, ¶¶ 451– 459).

from a brain impairment or damage. (Doc. # 180, at 44).

Petitioner asserts that, he was entitled to an examination that would determine whether he suffered from a brain impairment and alcoholism, and that "[n]either Dr. Schmidtgoessling, nor Dr. Cooper, conducted the necessary examinations to determine these issues." (*Id.* at 49). With respect to Dr. Schmidtgoessling, petitioner maintains that she was not qualified to conduct the type of testing and evaluation required to diagnose his organic brain damage, and that "[t]he shortcomings in Dr. Schmidtgoessling's very brief report were not limited to her inability to test for brain impairment." (*Id.* at 48). Petitioner cites Dr. Hawgood's affidavit, which he submitted during his state postconviction proceedings. Dr. Hawgood concluded that "Dr. Schmidtgoessling was not given sufficient time, or the necessary collateral data to prepare a competent mitigation report." (Supp.App., at 245). As a result, Dr. Hawgood concluded that Dr. Schmidtgoessling "was unable to provide a comprehensive picture of Mr. Sowell's development due to the lack of necessary data." (*Id.*). With respect to Dr. Cooper's evaluation, petitioner argues that Dr. Cooper failed to provide the level of assistance required by the Fourteenth Amendment because he did not have enough information about petitioner to perform a competent evaluation. Petitioner argues that the deficiencies in Dr. Cooper's evaluation are evident because "[t]he brevity of his report, slightly more than one page, highlighted the lack in information he possessed concerning Mr. Sowell." (Doc. # 180, at 48).

Respondent argues that petitioner did not present much of his third argument to the state courts during his state postconviction proceedings, or in the petition that he filed in this habeas action. According to respondent, in his state postconviction proceedings and in his habeas petition, petitioner argued only that his right to a competent psychologist was violated because the penalty phase experts failed to explain how his explosive personality disorder affected him in relation to the offense. Respondent argues that petitioner cannot now expand the claim to include allegations concerning his alcohol abuse and possible brain damage. (Doc. # 187, at 13). This Court agrees.

In his supplemental merits brief, petitioner appears to be expanding his twenty-sixth ground for relief to include a claim that Drs. Schmidtgoessling and Cooper did not perform effectively because they did not diagnose his alcoholism or his possible brain impairment. However, this claim was not raised in his initial habeas petition, or in his postconviction action before the Ohio state courts. Because petitioner has not raised this part of his third argument previously, and instead presented this allegation for the first time in his supplemental merits brief, it is not properly before the Court for a consideration on the merits. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir.2005) ("Because the penalty-phase insufficiency argument was first presented in Tyler's traverse rather than in his habeas petition, it was not properly before the district court, and the district court did not err in declining to address it."); *Palmer v. Bagley*, 2005 WL 3965400 (S.D.Ohio, Dec.16, 2005) ("A traverse, however, is not the proper vehicle in which to raise new claims or sub-claims in habeas corpus."); *Burns v. Birkett*, 2007 WL 2318740, *5, n. 2 (E.D.Mich. Aug.9, 2007) ("Because these claims are being presented for the first time in petitioner's traverse or reply brief, rather than in his habeas petition, this Court declines to address these claims, because they are not properly before this Court.").

However, even if the Court were to assume that petitioner's new allegations concerning his alcoholism and brain impairment are properly before the Court, the claim has no merit. Petitioner contends that Schmidtgoessling and Cooper did not have the time or expertise to develop a coherent and comprehensive analysis of petitioner's background, potential brain impairment, and alcoholism. As a result, petitioner argues, he did not receive necessary psychological assistance as recognized by the United States Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

■■■■ The Sixth Circuit has interpreted *Ake* to allow for psychiatric expert assistance during the sentencing phase if the defendant's sanity was a significant factor at trial, or if the state, during the sentencing phase, presents evidence of future dangerousness. *See Smith v. Mitchell*, 348 F.3d 177 (6th Cir.2003); *Thompson v. Bell*, 315 F.3d 566, 588–89 (6th Cir.2003); *Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir.2000). Although *Ake* guarantees a competent expert, it does not require that the expert testimony be the best testimony possible, or that the expert be one of the defendant's own choosing. *See, e.g., Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir.2006) ("Petitioner does not have a constitutional right to an expert whose conclusions favor Petitioner."); *Dennis v. Mitchell*, 68 F.Supp.2d 863, 881 (N.D.Oh.1999) (same). Furthermore, the Constitution does not entitle a criminal defendant to the effective assistance of an expert witness, only access to a competent expert. *See Davie v. Mitchell*, 291 F.Supp.2d 573, 616 (N.D.Oh.2003) ("A defendant is entitled to effective assistance of counsel, not effective assistance of experts."). "To entertain such claims would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric

examination was appropriate" and "it would undermine the finality of state criminal convictions, which would constantly be subject to psychiatric reappraisal years after the trial had ended." *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir.1998) (rejecting argument that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel). *See also Waye v. Murray*, 884 F.2d 765, 767 (4th Cir.1989) (same).

■■■■ Petitioner argues that pursuant to *Powell v. Collins*, 332 F.3d 376 (6th Cir.2003), Dr. Schmidtgoessling was not competent to perform the type of mitigation evaluation needed in his case. *Powell*, however, is distinguishable. In *Powell*, the Sixth Circuit held that the defendant was entitled to an independent psychiatrist after presenting sufficient facts showing that his diminished mental capacity would be his main defense. *Id.* at 382–83. In that case, the trial court refused to appoint an independent psychiatrist despite multiple requests by trial counsel for an independent expert. Instead, the trial court appointed Dr. Schmidtgoessling, a psychologist, as a court expert. In this case, on the other hand, counsel did not request the appointment of an expert of their own choosing, and they did not request a substance abuse specialist. Once the reports were submitted by Schmidtgoessling and Cooper, counsel did not challenge the thoroughness of the evaluations or the length of the reports, and counsel did not request additional testing or evaluation—decisions this Court determined to be reasonable. Because counsel did not request additional or different experts, the trial court cannot be found to have erred in not appointing such experts. Also, in *Powell*, Dr. Schmidtgoessling explained that she was not given sufficient time to conduct an appropriate investigation into Powell's

mental makeup, to interview necessary family members and acquaintances, or to run needed diagnostic tests. *Id.* at 395–96. In this case, there is no evidence, other than the opinion of Dr. Hawgood, that Drs. Cooper or Scmidtgoessling needed more information or time to perform a thorough evaluation.

■ It is well settled that "[a] licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Lundgren,* 440 F.3d at 772 (citing *Skaggs v. Parker,* 235 F.3d 261, 268 (6th Cir.2000)). In this case, petitioner attempts to challenge the competence of the experts who evaluated him by showing that another expert, Dr. Hawgood, found the methods, work, and results of Drs. Schmidtgoessling and Cooper to be inadequate and below commonly accepted professional standards. However, it will nearly always be possible, after the fact, to find one expert who disagrees with another and to procure an affidavit to that effect from the second prospective witness, and in this case, nothing in the record suggests that the evaluations performed by Drs. Cooper and Scmidtgoessling were substandard, or that either expert was incompetent. Accordingly, the Court finds petitioner's third argument to be without merit.

***ARGUMENT NO. IV:* THE PRESIDING JUDGE CONDUCTED AN *EX PARTE* MEETING WITH MEMBER(S) OF THE ADULT PROBATION DEPARTMENT CONCERNING ACCUSATIONS THAT MR. SOWELL HAD COMMITTED OTHER MURDERS.[5]**

In his fourth argument, petitioner argues that the trial court conducted an improper *ex parte* meeting with a member of

the adult probation department concerning accusations that petitioner had committed other uncharged murders. The facts underlying this claim, which are not nearly as developed as the Court would prefer, all appear on the face of the record. It appears that during the presentence investigation, a member of the probation department became aware of allegations that petitioner had confessed to two people that he had committed two other uncharged murders. Although the record is unclear as to what transpired next, it is undisputed that a member of the probation department informed Judge Crush of the possibility that petitioner had committed other murders. It is also undisputed that after learning of the allegations, Judge Crush requested that Dr. Schmidtgoessling explore the allegations with petitioner. Petitioner claims that Judge Crush ordered the investigation into the other murders without the knowledge or participation from defense counsel.

On October 27, 1983, Dr. Schmidtgoessling sent a report to the trial court detailing her discussions with petitioner concerning whether he had confessed to committing other murders. That report was included as part of the PSI, and made a part of the record, without objection from defense counsel. The report contained the following information:

Dear Judge Crush,

This letter is a response to the Court's request, via Nancy Ranklin, probation officer, regarding statements that Mr. Billy Joe Sowell is alleged to have made regarding two prior manslaughter convictions he may have. Ms. Rankin informed me that two individuals, one residing in the community and a person

5. This Argument includes the Eighteenth and Nineteenth Grounds for Relief. (Petition, doc.# 9, ¶¶ 355–363; 364–378).

employed at the Hamilton County Jail, overheard Mr. Sowell say that he had previously killed two people. At your request, Ms. Rankin asked me to explore this with the defendant.

I discussed these alleged statements with Mr. Sowell on October 26, 1983 at the Hamilton County Jail, during the course of my evaluation for his mitigation hearing. When he understood the issue presented, (I brought it up rather gradually in the context of historical material), he acted shocked and denied such statements. He became notably anxious and began talking about one officer, whom he named, who was "out to get him." This led to other statements on his part about how he believes the police are out to insure that he gets the death penalty and similar type statements. In his own mind, Mr. Sowell sees himself as a peace-loving, nonviolent person, and that such alleged actions would be unlike him. This mood of anxiety and concern lasted for the rest of the session, as he'd intrude on new data by saying things like "this really worries me." To the best of my observations, his shocked reaction seemed genuine. This information about these alleged statements is all second-hand, so it is not known whether Mr. Sowell made such statements or the context in which they may have been made. Some speculations about the meaning of such statements may be made, however. Mr. Sowell is an institution wise person, having spent considerable time in prison and jails. In this sense, it may be that he understands well how to attain status and command respect from others in jail. His statements, if he made such, could be an attempt to prepare himself for prison life. Another possibility to consider is that Mr. Sowell, when angry, apparently is under the influence of very strong feelings, and very weak cognitive

controls. When angry, it would perhaps be possible for Mr. Sowell to make very extreme sort of statements without clear awareness of the impact or meaning of his statements or memory that he had made these. Even when not angry, Mr. Sowell seemingly has a good grasp of how to intimidate others even if he had not intention of following through on such threats. Threats of physical harm to others is a fairy common way of settling disagreements even among people who have no major personality dysfunction not any history of acting on such threats.

(Supp.App., at 200–01).

Petitioner argues that Judge Crush violated petitioner's right to procedural due process and created an appearance of bias by pursuing his own investigation into the alleged other murders. Petitioner claims that the Due Process Clause prohibits the execution of a person on the basis of information that he had no opportunity to deny or explain and that the trial court's consideration of the *ex parte* allegations violated petitioner's right to a fair trial that is based only on the evidence presented in open court. Petitioner contends that the trial court's error cannot be deemed harmless simply for the reason that petitioner ultimately denied the commission of the other murders when asked about them by Dr. Schmidtgoessling. According to petitioner, "Judge Crush or another member of the panel may not have accepted those denials as credible, especially if another judge believed that Mr. Sowell was bragging about the other murders." (Doc. # 180, at 57).

Petitioner cites two lines of cases in support of his fourth argument. First, citing *State v. Roberts,* 110 Ohio St.3d 71, 850 N.E.2d 1168 (2006), petitioner argues that a violation of due process exists when

a party assumes more than one role in the judicial process. In *Roberts,* the prosecutor and the trial judge met *ex parte* to discuss the drafting of the sentencing opinion after the jury returned a recommendation of death. The Ohio Supreme Court vacated the death sentence and remanded the case for resentencing and the drafting of a new sentencing opinion, because "[t]he trial court's consultation with the prosecutor, particularly when undertaken without the knowledge or participation of defense counsel, can neither be ignored nor found to be harmless error." *Id.* at 94, 850 N.E.2d 1168. Petitioner argues that the conduct of Judge Crush, by assuming the role of presiding judge and investigator, was even more prejudicial than the conduct in *Roberts* because "[i]t occurred prior to evidence being presented in the mitigation phase" and "involved an effort to conduct a wholly inappropriate investigation for the purpose of identifying evidence that was to be subsequently presented in the mitigation phase." (Doc. # 180, at 54–55).

Next, citing *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), petitioner argues that the consideration of secret information mandates a reversal of his sentence. In *Gardner,* the Supreme Court vacated a sentence of death on the ground that the sentencing judge had considered a confidential presentence report without permitting the defendant or defense counsel to see the report. The plurality of the Court concluded that the defendant was denied due process because "the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.* at 360, 97 S.Ct. 1197. Petitioner submits that it is reversible error for members of the trier of fact to conduct their own investigation as to an accused's guilt or sentence, and that due process is violated when a death sentence is imposed, at least in part, on the basis of information that the defendant had no opportunity to explain or deny. According to petitioner, due process requires that the trier of fact decide his case based upon evidence adduced under oath and subject to cross-examination, and "[p]ermitting the trier of fact to make a decision based upon highly prejudicial evidence from an extra-judicial source violates this goal of calm and informed enforcement of the law." (Doc. # 180, at 55). Petitioner notes that there is no record of Ms. Rankin's communications with Judge Crush, and that "[c]onsequently, it is impossible to discern exactly what Judge Crush and the probation officer discussed concerning the alleged murders or even that Judge Crush and Ms. Rankin limited their conversation to only those alleged murders." (*Id.* at 56). Petitioner argues that "[o]utside contact with a member of the trier of fact involves such a high probability that prejudice will result, that any resulting verdict will be deemed to be lacking in due process." (*Id.*).

Petitioner presented this claim to the state courts during his post-conviction proceedings. The state courts determined that this claim was barred by the doctrine of *res judicata,* finding that it was a claim appearing on the face of the record that should have been raised on direct appeal. In this Court's *Opinion and Order* of February 19, 1998, the Court concluded that the state courts had erroneously dismissed this claim on the basis of *res judicata,* finding that the claim had been properly raised in post-conviction. (Doc. # 101). The Court reasoned that because one of petitioner's lawyers on direct appeal had also served as trial counsel, both appellate attorneys were relieved of any duty to raise, on direct appeal, trial errors which would have required them to identify instances where counsel had failed to lodge timely objections at trial. (*Id.* at 50–52).

On March 16, 1999, the Court granted in part a motion for reconsideration by respondent and reversed its procedural default ruling in that regard. (Doc. # 134). In that *Opinion and Order*, the Court held that the new attorney was required to raise on direct appeal not only any instances of trial counsel ineffectiveness, but also any instances of trial error to which counsel had failed to lodge a contemporaneous objection at trial, if those claims could have been determined from the face of the record. (*Id.* at 3–4). The Court concluded, however, that its reconsidered decision had little practical effect, because each of the claims affected had been included in petitioner's motion for delayed reconsideration of his direct appeal, which this Court determined had been filed in a reasonable and timely manner. (*Id.* at 5). The Court must revisit both of those decisions.

■■■■ A habeas petitioner procedurally defaults a claim where a state procedural rule prevents the state courts from reaching the merits of the petitioner's claim. Federal courts must consider four factors when determining whether a habeas petitioner has procedurally defaulted a claim:

First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must decide whether the state courts actually enforced the state procedural sanction. Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, the court must move to the fourth factor. *Fautenberry v. Mitchell*, 515 F.3d 614, 633 (6th Cir.2008). The fourth factor allows a petitioner to avoid or excuse the procedural default if he demonstrates "that there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error," or that a manifest miscarriage of justice will occur. *Id.* (citing *Maupin*, 785 F.2d at 138).

■■■■ As a general matter, a defendant who is convicted in Ohio of a criminal offense has available to him more than one method of challenging that conviction. Claims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of *res judicata*. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). Issues that must be raised in a postconviction action pursuant to R.C. § 2953.21 include claims that are supported by evidence *dehors* the record.

■■■■ The Sixth Circuit has determined that a habeas petitioner will be excused from raising a trial counsel ineffectiveness claim on direct appeal, even if it is a claim appearing on the face of the record, when one of his two appellate attorneys also represented him at trial. *Combs v. Coyle*, 205 F.3d 269, 276 (6th Cir.2000). Thus, this Court's ruling that petitioner's one new attorney on direct appeal was obligated to raise claims of ineffective assistance of trial counsel was incorrect, and the Court now holds that petitioner's claims of ineffective assistance of trial counsel were properly raised in post-conviction. The question before the Court is whether the rationale of *Combs* is limited to claims of ineffective assistance of counsel, or whether that rationale extends to the substantive underlying claims of trial error that counsel failed to preserve for review.

■ The Court is of the view that *Combs* does not extend to the underlying claims of trial error to which counsel failed to object at trial, and the Court finds that the ruling in *Combs* is limited to claims of ineffective assistance of trial counsel. The substantive claims of trial error should have been raised on direct appeal regardless of whether they had not been sufficiently preserved through a contemporaneous objection. To hold otherwise would eviscerate Ohio's doctrine of *res judicata* because there would be no incentive to challenge errors at trial or on direct appeal, and more importantly, no penalty for the failure to do so. Any underlying claims of trial error should have been raised on direct appeal, even if doing so required one of petitioner's appellate attorneys to draw attention to his own ineffectiveness for his failure to object at trial and preserve the claim under Ohio's contemporaneous objection rule.

■ The Court finds that petitioner's claim that the trial court conducted an improper *ex parte* meeting with a member of the adult probation department concerning accusations that petitioner had committed other murders, and then ordered an investigation into those accusations, is a claim of trial error appearing on the face of the record that should have been raised on direct appeal. Indeed, petitioner does not rely on any evidence *dehors* the record to support this claim. Petitioner should have raised his fourth argument on direct appeal but failed to do so, and the state courts refused to consider this claim during the state post-conviction proceedings on the basis of *res judicata*. The Sixth Circuit has routinely held Ohio's doctrine of *res judicata* to be an adequate and independent state procedural rule. *Hartman v. Bagley*, 492 F.3d 347, 357–58 (6th Cir.2007) ("This court has held that Ohio's application of its res

judicata rule generally constitutes an independent and adequate state ground that forecloses federal habeas review."); *Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir.2006) ("This court has consistently held that Ohio's doctrine of res judicata is an 'adequate and independent' ground justifying default."). Therefore, the only question remaining before the Court is whether cause and prejudice exists to excuse the default of petitioner's fourth claim, or whether a miscarriage of justice will occur if this Court does not review his defaulted claim. Petitioner has not attempted either showing and this Court is not persuaded that he could.

■ The Court notes that ineffective assistance of counsel may serve as cause for a procedural default only if the ineffective assistance of counsel claim itself is not procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). In this case, petitioner never asserted a claim of ineffective assistance of trial counsel for the failure to object to the trial court's investigation or the inclusion of Dr. Schmidtgoesling's report in the PSI. Therefore, the Court cannot consider such an argument as cause for the default of this claim.

Furthermore, the Court cannot consider whether the ineffective assistance of appellate counsel on direct appeal to the court of appeals constitutes cause. All of petitioner's claims of ineffective assistance of appellate counsel on direct appeal to the court of appeals are defaulted, because petitioner did not comply with the procedure used in Hamilton County for raising claims of ineffective assistance of appellate counsel set forth in *State v. Rone*, No. C–820640, 1983 WL 5172 (Ohio App.1st Dist. Aug. 31, 1983). Instead, petitioner attempted to raise his claims of ineffective assistance of appellate counsel in postconviction, and the state courts refused to

consider the merits of his claims. The Sixth Circuit concluded that this Court's prior decisions finding petitioner's claims of ineffective assistance of appellate counsel to be properly preserved for review, (doc. # 101; doc. # 134) were in error, and that petitioner's motion for delayed reconsideration of his direct appeal was in fact untimely. *See Sowell v. Bradshaw,* 372 F.3d 821, 827 n. 2 (6th Cir.2004) (finding that "the procedure required by Murnahan was the procedure that had been required since at least 1983 by the Ohio Court of Appeals in Hamilton County, where Sowell's trial and appeal were conducted."). In his supplemental reply brief, petitioner abandoned all claims of ineffective assistance of appellate counsel on his direct appeal to the first district court of appeals, in recognition of the Sixth Circuit's determination that *Rone* was firmly established at the time of his direct appeal. (Doc. # 186, at 3). Accordingly, ineffective assistance of appellate counsel cannot serve as cause to excuse the default of this claim.

Beyond the cause-and-prejudice exception, *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), recognized a second exception to the procedural default bar: the actual innocence exception. Specifically, *Murray* held that a federal habeas court may review an otherwise defaulted claim where an error "has probably resulted in the conviction of one who is actually innocent." *Id.* at 496, 106 S.Ct. 2639. In *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court held that petitioners attempting to establish the "actual innocence" gateway must show that, in light of new evidence, "it is more likely than not that no reasonable juror would have found

petitioner guilty beyond a reasonable doubt." *See also Souter v. Jones,* 395 F.3d 577, 602 (6th Cir.2005) (recognizing an actual innocence ground for equitable tolling of the statute of limitations that follows the standard set forth in *Schlup* ). "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623–24, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (citing *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)). Petitioner clearly cannot satisfy this "actual innocence" exception to secure review of the constitutional claims set forth in his fourth argument. He has never denied committing the underlying offenses or professed to have new evidence establishing otherwise.

In *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), the Supreme Court narrowly held that a federal habeas court may review an otherwise defaulted claim under the exceptionally limited circumstances where the petitioner could demonstrate "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under applicable state law." *Id.* at 336, 112 S.Ct. 2514.[6] As the Sixth Circuit recently explained, "*Sawyer's* 'innocence of the penalty' test applies to the finding of any special factor making the petitioner eligible for the death penalty, whether the factor forms an element of the offense of first-degree murder, or a sentencing enhancer." *Ross v. Berghuis,* 417 F.3d 552, 557 (6th Cir.2005) (citations omitted). It is difficult for this Court to conclude that petitioner can meet this "actual innocence"

**6.** The Supreme Court recently affirmed the contours of the narrow "actual innocence" exception in *Dretke v. Haley,* 541 U.S. 386, 393–94, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004), when it declined an opportunity to extend the actual innocence exception to non-capital sentencing errors.

exception either, in view of the fact that what little the record establishes about the improper nature of the trial court's investigation into whether petitioner had committed other uncharged murders does not apply particularly to any factor that made petitioner eligible for the death penalty. Because petitioner can demonstrate neither the cause and prejudice nor the fundamental miscarriage of justice exceptions, this Court must conclude that his fourth argument is procedurally defaulted.

The Court is troubled, however, by the circumstances here indicating that one of the three trial judges may have initiated an investigation into the possibility that petitioner committed other murders—conduct which this Court views as bordering on a structural error.[7] Due process entitles criminal defendants to a trial before a neutral, detached, and impartial judge. *See, e.g., In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). When a judge steps outside the confines of his judicial role, and assumes or appears to assume the additional role of advocate, his neutrality, as well as the fairness of the trial, are irreparably compromised. *Cf. Moore v. Mitchell,* 531 F.Supp.2d 845, 875 (S.D.Ohio 2008) (citing *Anderson v. Sheppard,* 856 F.2d 741, 746 (6th Cir.1988)). That is why the presence of a biased or partial judge constitutes a structural error.

Structural errors, unlike trial errors, are errors that so infect the framework of the trial process that the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Structural errors are not subject to harmless error review and require automatic reversal without requiring a showing of prejudice. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 309–310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante,* the Court identified five types of structural errors, including the presence of a partial or biased trial judge. *Id.* (citing *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)). Notwithstanding this Court's concern about the extra-judicial role that a trial judge would assume by initiating an investigation into the possibility that the defendant had committed uncharged murders, this Court is not prepared, based on the record before it, to conclude that the conduct at issue in this case rose to the level of a structural error. *See, e.g., Franklin v. McCaughtry,* 398 F.3d 955 (7th Cir.2005) (granting relief on claim of judicial bias where trial judge's unusual conduct of writing a memorandum to court of appeals defending decision to deny the defendant bail created inference that judge had "decided Franklin was guilty before he conducted Franklin's trial"); *Harrison v. Anderson,* 300 F.Supp.2d 690 (S.D.Ind.2004) (granting relief on claim

---

**7.** It is unclear if the Supreme Court has ever recognized that "structural errors" are not subject to procedural default. *See, e.g., Ward v. Hinsley,* 377 F.3d 719, 725–26 (7th Cir. 2004); *Hatcher v. Hopkins,* 256 F.3d 761, 764 (8th Cir.2001) (noting that the Supreme Court in *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), in detailing circumstances necessary to bypass procedural default, did not list "structural errors" among them). Since *Coleman,* the Supreme Court has repeatedly affirmed that a

federal habeas court may reach the merits of a procedurally defaulted claim only if the petitioner satisfies either the cause and prejudice test or the fundamental miscarriage of justice exception. *Bousley v. United States,* 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (no mention of "structural errors" as exception to procedural default); *Edwards v. Carpenter,* 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (same); *House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (same).

of judicial bias on the basis of pervasive examples throughout trial process demonstrating that judge was biased against the petitioner); *Ryan v. Clarke,* 281 F.Supp.2d 1008, 1033–39 (D.Neb.2003) (denying relief on claim of judicial bias where trial judge violated state law by holding ex parte conference with family members of victims prior to imposing death sentence).

Thus, even assuming this claim were not procedurally defaulted, and even though this Court remains troubled by the conduct at issue, this claim ultimately lacks merit. The Court has already noted that the record is not as developed as the Court would prefer with respect to this claim. Although petitioner claims that Judge Crush ordered the investigation into the other murders without the knowledge or participation of defense counsel, petitioner has not presented any evidence supporting the suggestion that counsel neither knew, participated in, nor acquiesced to the investigation. The record contains no evidence one way or the other as to whether counsel were or were not aware that Judge Crush had asked Dr. Schmidtgoessling to explore the matter with petitioner during her mitigation evaluation. Even assuming that the investigation was ordered without the knowledge or consent of counsel, it is important to note that Dr. Schmidtgoessling's report was included as part of the PSI. As such, trial counsel were on notice that Judge Crush had contact with a probation official and requested an investigation into the alleged statements by petitioner, yet counsel raised no objection at trial, and did not request that the information be stricken from the record.

Although, as noted above, the Court is troubled by the circumstances here indicating that one of the three trial judges may have initiated an investigation into the possibility that petitioner committed other murders, the fact remains that petitioner has pointed to nothing in the record suggesting that Judge Crush or any other member of the panel improperly considered, relied on, or was biased due to the information obtained as part of that investigation. Petitioner has offered this Court nothing but speculation, and the Court would not grant a writ of habeas corpus based upon undeveloped and conclusory assertions.

Additionally, an argument could be made that that the information contained in Dr. Schmidtgoessling's letter to Judge Crush was beneficial, rather than prejudicial. Unlike the defendant in *Gardner,* petitioner had an opportunity to deny or explain the accusations, and the information contained in Dr. Schmidtgoessling's report all but dispelled the rumors that he had committed other murders. Dr. Schmidtgoessling reported that petitioner was shocked when confronted with the allegation that he had admitted to committing other murders. Petitioner denied making such statements, and Dr. Schmidtgoessling noted that to the best of her observations, "his shocked reaction seemed genuine." (Supp.App., at 200). She reiterated that the information concerning petitioner's alleged statements was "all second-hand," and that "it is not known whether Mr. Sowell made such statements or the context in which they may have been made." (*Id.*). Dr. Schmidtgoessling speculated that if petitioner did make the statements, he may have done so in an attempt to prepare himself for prison life. Specifically, Dr. Schmidtgoessling opined that "Mr. Sowell is an institution wise person, having spent considerable time in prison and jails. In this sense, it may be that he understands well how to attain status and command respect from others in jail." (*Id.*). Furthermore, Dr. Schmidtgoessling noted petitioner's weak cognitive controls when angry, and stated that "it would perhaps be possible for Mr. Sowell

to make very extreme sort of statements without clear awareness of the impact or meaning of his statements or memory that he had made these." (*Id.* at 201). In short, petitioner's fourth argument does not warrant habeas corpus relief, as it is both procedurally defaulted and without merit.

***ARGUMENT NO. V:* THE TRIAL COURT ERRED WHEN IT ADMITTED INTO EVIDENCE THE RECOMMENDATION OF DEATH BY THE CINCINNATI POLICE DEPARTMENT.[8]**

During the mitigation hearing, the trial court admitted into evidence the PSI prepared by the probation department. The PSI contained a section addressing victim impact. That section included statements from Pam Billups, Calvert Graham's brother, and Specialist Ronald Camdon of the Cincinnati Police Department. Petitioner does not allege error with respect to the admission of the statements from Calvert Graham's brother or Pam Billups, but argues that the trial court erred when it admitted the victim impact statement of Specialist Camdon into evidence.

The following statement was attributed to Specialist Camdon and included in the PSI:

*Arresting Officer's Statement:*

Specialist Ron Camdon of the Cincinnati Police Homicide, is the investigating officer. He describes the defendant as being very hostile at the time of arrest. He would give no statement to police and shouted angrily at officers during the questioning. Specialist Camdon feels that the defendant is a very violent person and should he be given an opportunity will kill again. Specialist Camdon cites the defendant's prior record which

includes many Assault and Menacing charges along with a weapon conviction to support his feelings. In the opinion of Specialist Camdon if the defendant is placed in prison within the general prison population he will continue to be a threat to others and could very easily kill again. He also suggested the only appropriate sentence for the defendant is the death penalty.

(Supp.App., at 198–199).

Petitioner sets forth two arguments in support of his contention that the trial court erred by admitting above statement into evidence. First, petitioner argues that the statement contained an inadmissible sentencing recommendation in violation of his right to due process and a fair sentencing determination. Second, petitioner argues that Specialist Camdon's statement contained inaccurate information regarding petitioner's conduct during and after his arrest, and the statement "requested that the panel of judges penalize Mr. Sowell for asserting his constitutional right against self-incrimination and refusing to make a statement when arrested." (Doc. # 180, at 59). The Court will address petitioner's arguments in turn.

**A. Sentencing Recommendation**

Citing *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), petitioner argues that he is entitled to habeas relief because the Eighth and Fourteenth Amendments preclude the consideration of victim impact evidence concerning the appropriate punishment in capital cases. (Doc.# 180 at 59). In *Booth,* the Supreme Court held that the introduction of victim-impact evidence "at the sentencing phase of a capital murder trial violates the Eighth Amendment."

---

**8.** This Argument includes the Fifteenth Ground for Relief. (Petition, doc.# 9, ¶¶ 325– 334).

482 U.S. at 509, 107 S.Ct. 2529. A short time later, the Supreme Court reversed *Booth*, in part, declaring that "if the State chooses to permit the admission of victim impact evidence ..., the Eighth Amendment erects no *per se* bar." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, the Court in *Payne* specifically noted that it was not addressing whether the Eighth Amendment prohibits victim impact evidence concerning the "appropriate sentence" because "no evidence of the latter sort was presented at the trial in this case." *Id.* at 829 n. 2, 111 S.Ct. 2597. As the Sixth Circuit recently remarked in *Fautenberry v. Mitchell*, 515 F.3d 614 (6th Cir.2008), "[t]he Payne Court noted that it overturned only that part of Booth that that disallowed 'evidence relating to the victim and the impact of the victim's death on the victim's family'" and "[t]he Court did not disturb that portion of Booth that forbids 'a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence.'" *Id.* at 638 (Internal citations omitted). Thus, "th[at] portion of *Booth's* holding 'survived the holding in Payne and remains valid.'" *Id.* (citing *Welch v. Sirmons*, 451 F.3d 675, 703 (10th Cir.2006)). However, the Sixth Circuit concluded that *Booth*, which involved the improper admission of victim impact evidence to a jury, "has minimal relevance when the victim-impact evidence is presented to a three-judge panel." *Id.* at 639. The Court noted that *Booth* was concerned specifically with the inflammatory effect that these types of statements might have on a jury, but "[t]hose considerations are severely diminished—if not entirely obviated—when the sentencer is a judge or a three-judge panel, rather than a lay jury." *Id.*

On direct appeal, the Ohio Supreme Court rejected petitioner's claim, reasoning that *Booth* does not apply to situations where a defendant is tried by a three-judge panel rather than a jury. The Ohio Supreme Court agreed that it was improper for the trial court to admit the victim impact statement into evidence, but found that the error did not warrant reversal because " '[t]he risks of arbitrary and prejudicial sentencing which guided the court in Booth are not present in the case sub judice because this case was before a three-judge panel rather than a jury.'" *State v. Sowell*, 39 Ohio St.3d 322, 328, 530 N.E.2d 1294 (1988) (*citing State v. Post*, 32 Ohio St.3d 380, 513 N.E.2d 754 (1987)). The court ruled that in the absence of evidence that the three-judge panel affirmatively relied on the victim impact evidence in arriving at its sentencing decision, the admission of such evidence did not constitute prejudicial error. *Id.* With respect to petitioner's case, the court held that "nothing in the panel's written opinion indicates that it relied upon the victim impact statement in reaching its sentencing determination" and "[n]o reference was made to the use of such evidence in the weighing process." *Id.*

The question before this Court is whether the inclusion of Officer Camdon's sentencing recommendation in the PSI was so unduly prejudicial as to render petitioner's trial and sentence fundamentally unfair. Petitioner is not entitled to relief on this claim unless he can demonstrate that the three-judge panel considered the victim impact statement when it imposed the sentence of death. *See Cooey v. Anderson*, 988 F.Supp. 1066, 1090–1091 (N.D.Ohio 1997) (petitioner not entitled to habeas relief on victim impact claim because he could not demonstrate that three-judge panel considered statements in reaching its sentencing decision). In reviewing petitioner's claim, the Ohio Supreme Court determined that there was no evidence suggesting that the panel relied upon or

considered the sentencing recommendation offered by Specialist Camdon, and petitioner has not directed this Court's attention to any such evidence. Additionally, the Court has conducted an independent review of the record and can find no indication that the court relied on the victim impact statement at issue. The Court has reviewed the announcement made by the trial court at the conclusion of the penalty phase, as well as the trial court's written opinion, and finds no mention of the victim impact statements. Petitioner simply fails to point to any evidence suggesting that the panel considered the improper sentencing recommendation when determining that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. Accordingly, petitioner is not entitled to relief on this sub-claim.

### B. Inaccurate Information and Post-arrest Silence

Petitioner challenges the portion of Specialist Camdon's statement alleging that petitioner was "very hostile at the time of his arrest" and "would give no statement to police." (Doc.# 180 at 58). According to petitioner, Camdon stated that petitioner was uncooperative at the time of his arrest, even though Camdon was not on duty or even present at the time of petitioner's arrest. The arresting officer, Specialist Hoffman, testified that petitioner did not resist arrest and was cooperative when arrested. Thus, according to petitioner, the victim impact statement contained inaccurate information. Additionally, petitioner argues that under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the information regarding his refusal to make a statement to police was inadmissible, because the use of a defendant's silence after receiving *Miranda* violates due process. Petitioner asserts that "a court cannot use evidence of a defendant's exercise of a basic fundamen-

tal right to sentence him to death," and "the exercise of his Fifth Amendment right to remain silent was not relevant to the charges or his character as it relates to the appropriate sentence." (*Id.* # 180, at 64).

■ As stated above, petitioner's case was tried to a three-judge panel instead of a jury. It is reasonable to presume that a trial panel, as opposed to a jury, will be scrupulous enough to avoid admitting or considering improper evidence in its sentencing decision. *See State v. Lott*, 51 Ohio St.3d 160, 176, 555 N.E.2d 293 (1990); *see also State v. Post*, 32 Ohio St.3d 380, 383–84, 513 N.E.2d 754 (1987). Such has been the state of the law in Ohio since 1968. In *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968), the Ohio Supreme Court noted that it would indulge "in the usual presumption that in a bench trial in a criminal case the [trial] court considered only the relevant, material, and competent evidence in arriving at its judgement unless it affirmatively appears to the contrary." Federal courts considering this question indulge the same presumption. *See e.g., United States v. Busch*, 758 F.2d 1394, 1398 (10th Cir.1985); *United States v. Impson*, 562 F.2d 970, 971 (5th Cir.1977); *United States ex rel. Placek v. Illinois*, 546 F.2d 1298, 1304–1305 (7th Cir.1976).

In this case, the record is devoid of any indication, not to mention affirmative evidence, that the trial court relied upon improper evidence. There simply is no mention or reference, either during the sentencing hearing or in the court's written sentencing opinion, to petitioner's conduct during arrest, or his decision to invoke his right to counsel. For all of these reasons, the Court rejects petitioner's fifth argument and finds it to be without merit.

*ARGUMENT NO. VI:* **THE TRIAL COURT EMPLOYED THE WRONG STANDARD OF PROOF AND REFUSED TO GIVE WEIGHT TO MITIGATING EVIDENCE WHEN IT IMPOSED MR. SOWELL'S DEATH SENTENCE.**[9]

Petitioner's sixth argument has four sub-parts. In sub-parts A, B and C, petitioner contends that the trial court committed three separate constitutional errors when it weighed the aggravating circumstance against the mitigating factors and determined that death was the appropriate sentence. (Doc. # 180, at 65). Specifically, petitioner argues that the trial court shifted the burden to petitioner to prove that the mitigating factors outweighed the aggravating circumstance, failed to take into account that petitioner's consumption of alcohol was the reason that he lost self-control on the night of the shooting, and improperly considered non-statutory aggravating circumstances to support the imposition of a sentence of death. (*Id.* at 65–66). In sub-part D, petitioner alleges that the above three errors "resulted in a fourth error, namely that the prosecution failed to meet its burden of proof, and Mr. Sowell should have never been sentenced to death." (*Id.* at 65).

In sub-part A, petitioner argues that the trial court applied the wrong burden of proof when it weighed the aggravating circumstance against the mitigating factors. Petitioner maintains that the panel misinterpreted Ohio law, which places the burden of proof on the state to prove that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Petitioner argues that on one occasion, "[t]he panel expressly indicated that the prosecution did not have the burden of

proof in the mitigation phase, much less the burden beyond a reasonable doubt." (*Id.* at 66, citing Supp.App., at 137). Petitioner contends that "[w]orse still, the trial court ruled that it was incumbent upon Mr. Sowell to establish, by the preponderance of the evidence, that the mitigating circumstances outweighed the aggravating circumstances." (*Id.*). Petitioner notes that ultimately the trial court did identify the correct legal standard, but argues that "it is impossible, with any certainly, to identify which standard the panel applied, because it had already identified the incorrect standard." (*Id.* at 67).

Petitioner raised this claim on direct appeal to the court of appeals as his seventh assignment of error, and before the Ohio Supreme Court as his eleventh proposition of law. The Ohio Supreme Court determined petitioner's argument to be without merit. The court recognized that the trial court stated in its opinion that "the legislature has guided us to the extent that it has declared that the death penalty must be imposed unless the mitigating factors outweigh the aggravating circumstances." *State v. Sowell,* 39 Ohio St.3d 322, 334, 530 N.E.2d 1294. However, the Ohio Supreme Court concluded that "we are convinced by a closer examination of the trial court's opinion that it did apply the correct standard under R.C. 2929.03(D)." The Ohio Supreme Court cited a passage from the trial court's opinion which stated that "[t]he sole issue which confronts the Court at this time is stated as follows: 'Did the State of Ohio prove beyond a reasonable doubt that the aggravating circumstances which the defendant, Billy Joe Sowell, was found guilty of committing outweigh the factors in mitigation of the imposition of the sentence of

---

**9.** This Argument includes the Twenty–Eighth, Twenty–Ninth, Thirtieth, and Thirty–First Grounds for Relief. (Petition, doc.# 9), ¶¶ 468–481, 482–485, 486–458 (numbering error in the *habeas* petition), and 459–468 (numbering error).

death.' " *Id.* The Ohio Supreme Court also noted that the trial court, in making its finding, stated that "the panel unanimously concludes that the aggravating circumstances have been proven by the prosecution beyond a reasonable doubt to outweigh all the mitigating factors advanced by the defendant." *Id.* Based on a review of the entire sentencing proceedings, the Ohio Supreme Court held that the trial court applied the proper burden of proof for imposing a sentence of death.

In sub-part B, petitioner argues that the trial court erroneously considered non-statutory aggravating circumstances in arriving at its sentencing determination. According to petitioner, the trial court improperly considered the nature and circumstances of the offense, that the offense was committed with prior calculation and design, petitioner's prior criminal record, and the history, character, and background of petitioner. Petitioner argues that the panel admitted that it considered multiple aggravating circumstances because the panel stated, in its sentencing decision, that it considered the "aggravating circumstances," despite the fact that the indictment contained only one capital specification. (*Id.* at 68–69).

Petitioner raised this claim as his ninth assignment of error before the court of appeals, and as his fourth proposition of law before the Ohio Supreme Court. The Ohio Supreme Court rejected petitioner's argument, finding that the trial court considered only one aggravating circumstance—that this case involved a course of conduct by petitioner that resulted in the purposeful killing of or attempt to kill two or more people. *State v. Sowell,* 39 Ohio St.3d 322, 329, 530 N.E.2d 1294(1988).

In sub-part C, petitioner argues that the three-judge panel failed to consider mitigating evidence, and did not sufficiently take into account his alcoholism and his level of intoxication at the time of the shootings. Petitioner argues that "the trial court failed to consider a primary reason why Mr. Sowell should not be sentenced to death—namely, that his intoxication resulted in his inability to otherwise refrain from the conduct that led to Graham's death." (Doc. # 180, at 69). The trial court's conclusion that there was "no evidence of drunkenness," is incorrect, petitioner argues, because the trial transcript shows that he was drunk and high on marijuana at the time of the shootings. Petitioner claims that defense counsel presented evidence of his intoxication, and therefore, "[t]he trial court erred profoundly when it ignored his disease of alcoholism and the impact alcohol played on the crimes at issue." (Doc. # 180, at 73).

The intermediate court of appeals held that voluntary intoxication could not be considered a mitigating factor because it did not constitute a valid defense in the state of Ohio. Judge Shannon, concurring separately, found that voluntary intoxication should be considered a relevant mitigating factor, but because petitioner purposely and intentionally killed Graham, that factor should be given little weight. On direct appeal to the Ohio Supreme Court, petitioner argued, in his first proposition of law, that the *court of appeals* refused to consider his voluntary intoxication at the time of the offense to be a mitigating factor. Petitioner did not argue, as he does herein, that the *trial court* refused to consider intoxication as a mitigating factor.

The Ohio Supreme Court held that the court of appeals erred when it refused to consider petitioner's voluntary intoxication as a mitigating factor. The court concluded that voluntary intoxication may be considered a mitigating factor where it either lessens the moral culpability of a defen-

dant for an offense, or renders the death sentence less appropriate in a given case. The court held that "[t]he diminished capacity of intoxicated persons to appreciate the wrongfulness of their conduct, and to refrain from such conduct, may well be a relevant consideration in determining the degree of punishment to be inflicted upon them when such conduct is unlawful." *State v. Sowell*, 39 Ohio St.3d 322, 325, 530 N.E.2d 1294 (1988). The court determined, after an independent review of the record, that the error was harmless because petitioner's claim of intoxication was entitled to "little or no weight." *Id.* at 337, 530 N.E.2d 1294.

Finally, in sub-part D, petitioner asserts that the prosecution did not meet its burden of proving that the aggravating circumstance outweighed the mitigating evidence. Petitioner argues that during the mitigation phase, his counsel called four witnesses who testified about the kind of person that petitioner was when he was not drinking. Those witnesses, petitioner argues, testified about his "desire to give, contribute, and be a productive and positive member of society." (Doc. # 180, at 73). Petitioner claims that "because the panel disregarded Mr. Sowell's intoxication, the trial court was, in turn, incapable of fully considering the mitigating evidence upon which defense counsel relied upon at the mitigation hearing." (*Id.*).

On direct appeal to the Ohio Supreme Court, petitioner raised this claim as his tenth proposition of law. The Ohio Supreme Court rejected the claim, finding, after its own independent reweighing, that the state had proven beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. *See Sowell*, 39 Ohio St.3d 322, 336–37, 530 N.E.2d 1294 (1988). The Ohio Supreme Court determined:

Our next concern is the independent review of the record required of this court by R.C. 2929.05(A), for the purpose of determining whether the mitigating factors present in this case are outweighed by the aggravating circumstance appellant was found guilty of committing. Of the mitigating factors enumerated in R.C. 2929.04(B), only numbers (2) and (7) are applicable under the circumstances of this case.

R.C. 2929.04(B)(2), which requires the sentencing body to consider whether "it is unlikely that the offense would have been committed, but for the fact that the offender was under ... strong provocation ...," is relevant because appellant testified that his actions were motivated by the belief that Billups had robbed him. Nevertheless, this factor is entitled to little weight. This alleged provocation cannot be considered as an extenuating circumstance for the murder of Graham, since appellant suspected Billups, not Graham, of the theft.

R.C. 2929.04(B)(7), which directs the sentencer to consider "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death ...," is relevant in that appellant claims to have been intoxicated at the time of the offense. However, appellant's claim of intoxication is entitled to little or no weight in this case for two reasons. First, appellant failed to produce any evidence of intoxication during the sentencing hearing. Second, the evidence establishes that appellant possessed the capacity to form a specific intent and to appreciate the wrongfulness of his conduct at the time of the crime. Both courts below found appellant to have been sufficiently clear-minded to commit purposeful action with calculation and design, as evidenced by the fact that appellant purposely tricked. Graham into opening the apartment

door by having Waugh knock and claim to be someone named "Portia."

In a further attempt at establishing mitigation, appellant offered evidence that he possesses an altruistic nature. In the past, appellant has helped children, prevented crimes, and provided food and money to people in need.

However, taking all the foregoing into account, we have no doubt that the aggravating circumstance appellant was found guilty of committing outweighs the mitigating factors present in this case. Appellant's belief that Billups had robbed him, his alleged intoxication at the time of the crime and his altruistic nature simply do not outweigh the fact that he committed a brutal and senseless murder as part of a course of conduct involving the purposeful killing of one person and the attempt to kill another.

*Id.*

Respondent argues that petitioner's entire sixth argument is without merit because, pursuant to § 2929.05(A) of the Ohio Revised Code, the Ohio Supreme Court cured any errors committed by the trial court by independently reweighing the aggravating circumstance against the mitigating factors. Respondent contends that the errors alleged by petitioner are the same types of error that the United States Supreme Court determined that the Mississippi Supreme Court had cured in *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

 After considering each of the claims raised by petitioner, the Court finds petitioner's sixth argument to be without merit. A close examination of the sentencing proceedings convinces the Court that the trial court did apply the correct legal standard, pursuant to § 2929.03(D), in sentencing petitioner to death. Furthermore, the Court is not convinced that the three-

judge panel considered more than one aggravating circumstance in this case—that the case involved a course of conduct by petitioner that resulted in the purposeful killing of or attempt to kill two people. With respect to petitioner's claim that the trial court refused to consider relevant mitigating evidence concerning his intoxication, petitioner did not present this claim to the state courts, and therefore, it is defaulted. Finally, and most importantly, the Court agrees with respondent that the Ohio Supreme Court cured any possible errors committed by the trial court by independently reweighing the aggravating circumstance against the mitigating factors.

Under former Ohio Revised Code § 2929.05(A), the Ohio appellate courts were required to "independently reweigh" the aggravating circumstances against the mitigating factors:

> The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that *they shall review and independently weigh all of the facts and other evidence* disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate.

(emphasis added). Pursuant to that section, the Ohio Supreme Court independently reweighed the aggravating and mitigating factors in petitioner's case and affirmed the sentence of death.

In *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), the United Ohio Supreme Court held that er-

rors by the sentencing court in weighing aggravating and mitigating factors could be cured by reweighing in the state appellate court. In *Clemons*, the original death sentence was imposed by a jury, but based in part on an aggravating factor that was improperly introduced. The Mississippi state appellate court reweighed the aggravating and mitigating factors without the improper aggravating factor, and found that the death sentence was appropriate. The Supreme Court affirmed the death sentence, reasoning that:

> The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime. In scrutinizing death penalty procedures under the Eighth Amendment, the Court has emphasized the twin objectives of measured consistent application and fairness to the accused. Nothing inherent in the process of appellate reweighing is inconsistent with the pursuit of the foregoing objectives.
>
> * * *
>
> It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in "weighing" States, to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed. And, as the opinion below indicates, a similar process of weighing aggravating and mitigating evidence is involved in an appellate court's proportionality review. Furthermore, this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency.

*Id.* at 748–49. With respect to the procedure used in Ohio, the Sixth Circuit has repeatedly held that O.R.C. § 2929.05(A) satisfies the requirements of *Clemons*.

*See, e.g., Reynolds v. Bagley*, 498 F.3d 549 (6th Cir.2007) (upholding the Ohio Supreme Court's use of "appellate reweighing" specifically authorized under *Clemons*); *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir.2007) ("where, as here, the state appellate courts independently reweigh only the *relevant,* statutorily recognized aggravating circumstances against the mitigating factors and determine death to be an appropriate sentence, the jury's consideration of an irrelevant, nonstatutory aggravating factor is generally not prejudicial."); *Baston v. Bagley*, 420 F.3d 632, 637 (6th Cir.2005) (finding that "reweighing by the Ohio Supreme Court satisfied the requirements of *Clemons* and cured the alleged sentencing errors"); *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003) ("Both Supreme Court precedent and Ohio law allow reweighing by the appellate courts when the sentencer has considered an invalid aggravating circumstance."); *Cooey v. Coyle*, 289 F.3d 882, 888–89 (6th Cir.2002) ("the federal Constitution does not prohibit reweighing or harmless error analysis as a cure for weighing errors"); *Fox v. Coyle*, 271 F.3d 658, 667 (6th Cir.2001) (same).

Just as an appellate court can cure weighing errors by refraining from considering impermissible evidence, the appellate court can cure errors by considering relevant mitigating evidence that should have been considered at trial. *See Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir.2006) ("This Court has held that reweighing by the Ohio Supreme Court under Ohio Rev. Code § 2929.05(A) satisfies the requirements of *Clemons* when the court either eliminates impermissible aggravating factors or adds overlooked mitigating factors."); *see also McGuire v. Mitchell*, 2007 WL 1893902, *14 (S.D.Oh. July 2, 2007) (finding "there is no reason that an appellate court could properly reweigh after removing an aggravating factor from con-

sideration, but could not do so after adding an additional mitigating factor").

In this case, even if the trial court did commit the errors the petitioner alleges, the Ohio Supreme Court undertook an independent reweighing of the aggravating and mitigating factors without considering the aggravating factors to which petitioner complains, and with due consideration to the mitigating evidence that petitioner offered. In so doing, the court determined that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt, thereby finding that a death sentence was properly imposed upon petitioner. Petitioner fails to present any evidence suggesting that the Ohio Supreme Court considered an unconstitutional or unsubstantiated aggravating circumstance, or failed to employ the proper standard of proof. Nor does he allege that the Ohio Supreme Court failed to consider any mitigating factors, such as his claim of intoxication, for which evidence was presented. Accordingly, the Court finds that the independent reweighing employed by the Ohio Supreme Court cured any error that petitioner contends occurred at the trial court level.

*ARGUMENT NO. VII:* **THE TRIAL PROSECUTORS SUPPRESSED EXCULPATORY EVIDENCE.**[10]

In his seventh argument, petitioner alleges that the trial prosecutors failed to disclose *Brady* material. Like petitioner's second argument, this claim also pertains to the proposed testimony of Jerrell Perrin. Perrin lived on the same floor of the apartment building as petitioner and Calvert Graham. On the night of the shooting, Perrin saw petitioner standing outside of Graham's apartment, heard petitioner ask Pamela Billups to return his money,

and heard Billups respond by shouting profanity at petitioner. (Perrin Affidavit, Supp.App. at 264). Perrin also knew that Billups was a prostitute, had a reputation for dishonesty, and was known for stealing money from her customers. (*Id.*). According to petitioner, Perrin provided this information to the police, but this information was not disclosed to the defense. (Doc.# 180, at 78). Petitioner contends that in response to his timely motion for discovery, "[t]he prosecution provided Perrin's name, but did not identify the nature of the information that she possessed." (*Id.*). Petitioner maintains that the identification of a potential witness in discovery does not relieve the prosecution of its duty to identify the exculpatory evidence that the witness possesses.

Petitioner argues that the information obtained from Perrin qualifies as *Brady* material, and the prosecution had a duty to provide defense counsel with any information in its possession that would support the defense theory of the case, or rebut the theory of the prosecution. According to petitioner, "[i]t was the defense's theory at trial that Mr. Sowell passed out from alcohol and drugs, Billups took his money, Mr. Sowell awoke to find his money missing, he begged Billups and Graham to return his money, and only after his efforts failed, did the incident take place." (*Id.* at 79). Petitioner claims that "Ms. Perrin possessed information concerning the background of Billups, and the peaceful efforts that Mr. Sowell made to have his stolen money returned." (*Id.* at 80). Perrin also knew that petitioner had a reputation for carrying money. (*Id.*) Petitioner argues that this information was exculpatory "because it made it more likely that Mr. Sowell was carrying the money stolen

---

**10.** This Argument includes the Fourth Ground for Relief. (Petition, doc. # 9, ¶¶ 209–218).

later that day" and "[i]t also would have made it more likely that Billups committed the theft" because "[s]he would have known that she was likely to benefit by pilfering through Mr, Sowell's pockets after he passed out from the alcohol and marijuana." (*Id.*).

Petitioner presented this *Brady* claim to the state courts in his postconviction proceedings. The court of appeals determined that although there was a reasonable inference that the state failed to disclose the substance of Perrin's proposed testimony, that testimony would have been cumulative of the evidence presented during petitioner's trial. *State v. Sowell,* 73 Ohio App.3d 672, 598 N.E.2d 136, 140 (1st Dist.1991).

■ The state's failure to disclose evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To assert a cognizable *Brady* claim, a habeas petitioner must show that (1) evidence favorable to the petitioner, whether exculpatory or for impeachment purposes, (2) was suppressed by the government, either willfully or inadvertently, and (3) the petitioner suffered prejudice as a result. *See Apanovitch v. Houk,* 466 F.3d 460, 474 (6th Cir.2006). The *Brady* rule applies only to evidence known by the state but unknown to the defense. *Poindexter v. Mitchell,* 454 F.3d 564, 586 (6th Cir.2006).

■ The failure to disclose such evidence is material, and therefore prejudicial, only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). A "reasonable probability" of a different outcome exists where the government's suppression of evidence undermines confidence in the outcome of the trial. *Apanovitch,* 466 F.3d at 475. The prejudice must have worked to the petitioner's actual and substantial disadvantage, thereby infecting his entire trial with an error of constitutional dimension. *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The withheld items of evidence must be considered collectively, not individually, to determine materiality. *Castleberry v. Brigano,* 349 F.3d 286, 291 (6th Cir.2003).

■ Assuming, as the state courts did, that the state failed to disclose the substance of Perrin's proposed testimony to the defense, the Court cannot find that there is a reasonable probability that the outcome of petitioner's trial would have been different had the substance of Perrin's statement been disclosed. In the section of this *Opinion and Order* addressing petitioner's second argument, the Court addressed the issue of whether any prejudice had resulted from counsel's failure to investigate and call Perrin to testify as a witness during petitioner's trial. That same analysis also applies in the context of petitioner's *Brady* claim. Perrin's opinion that Billups had a reputation as a thief is consistent with Blimps' own admission at trial, in that Billups admitted having served time for a theft offense. (Tr. Trans. at 193). Furthermore, Perrin's affidavit actually contradicts petitioner's trial testimony, and the defense theory of the case, in several key respects. Petitioner testified that he did not argue with Billups about his money, yet Perrin's statement quite clearly states that she heard petitioner and Billups arguing. More importantly, Perrin's affidavit states that she heard the sounds of gunfire twenty to thirty minutes after the argument. This statement directly contradicts petitioner's testimony

that the shooting happened "far less than five minutes" after he left the apartment, and calls into question the defense theory that this offense was committed without sufficient time to form the intent necessary for prior calculation and design. Therefore, the Court finds that petitioner cannot establish that the information at issue was material, because the information was neither exculpatory or impeaching, and there is no reasonable probability that the outcome of petitioner's trial would have been different had Perrin had testified as a witness in this matter. Accordingly, the Court finds that petitioner is not entitled to relief on the *Brady* claim contained in his seventh argument.

*ARGUMENT NO. VIII:* **THE MISCONDUCT OF THE TRIAL PROSECUTORS DURING THEIR CROSS EXAMINATION OF MR. SOWELL DEPRIVED HIM OF A FAIR TRIAL.**[11]

In his eighth argument, petitioner raises two claims of prosecutorial misconduct, both of which pertain to the prosecutor's cross-examination of petitioner during the guilt phase of his trial. First, petitioner argues that the prosecutor committed a *Doyle* violation by questioning him about his decision to remain silent after being advised of his *Miranda* rights. Second, petitioner contends that the prosecutor deprived him of due process and a fair trial by questioning him about his prior contacts with law enforcement.

As with petitioner's fourth argument, respondent urges the Court to reconsider its procedural default ruling with respect to this claim. Respondent argues that petitioner's eighth claim is a claim appearing on the face of the record that should have

been raised on direct appeal, rather than in postconviction. This Court agrees, and for reasons more fully discussed in the section of this *Opinion and Order* addressing petitioner's fourth argument, the Court finds that this is a claim appearing on the face of the record that should have been raised on direct appeal. The state courts refused to consider the merits of this claim, finding that it was barred by the doctrine of *res judicata* because petitioner did not rely on any evidence *de hors* the record to support his claim. Petitioner has not offered cause or prejudice to excuse this default, nor has he argued that a manifest miscarriage of justice will occur if the Court does not consider this claim.

■ The Court finds, however, that even if petitioner's eighth argument was properly before the Court for a consideration on the merits, it lacks merit. The portion of the prosecutor's cross-examination of petitioner that is relevant to this claim is as follows:

Q. Okay now, the police arrested you not too long afterwards, is that correct?

A. Yes.

Q. Did you tell the police that night what happened after they arrested you?

A. Didn't make no statements to the policeman whatsoever.

Q. Did you tell the police that these people had robbed you and that's why you shot them?

A. I didn't make no statements, no.

Mr. Faller: Objection.

The Court: We've got to rule on it. What was the question?

---

**11.** This Argument includes the Eighth and Ninth Grounds for Relief. (Petition, doc.# 9, ¶¶ 252–256; 257–267).

Mr. Faller: My objection is the prior question—said I didn't say anything to the police.

The Court: Oh okay, overruled.

Q. Did you tell the police that these people had robbed you?

A. No, the policeman asked me what happened. I said to the policeman that I wouldn't like to say anything unless I am in the presence of an attorney.

Q. Okay. Did you open your mouth at any time after that and say any words to a police officer?

Mr. Pinales: Objection, your Honor.

The Court: Overruled.

Q. Did you ever talk with a police officer after that or did you just sit there moot?

A. Well, most of the police officers know me from working at the Huntley Apartments....

Q. That's the way you know them, from the Huntley Apartments?

A. Well, I know them from Huntley Apartments, I know them cause I used to work at the hotel carry-out and the gentleman in which I was working for, most of them goes over to his store and I met some of them there, they knew me when I used to drink a lot and some of them knew me when I really stopped drinking, and when I really stopped working. As a matter of fact when the police officers, when I quit my job he tried to help me with my kid, when my kid was born he asked me did I need any money or did I need him to do anything for me?

Q. Is that the only way you know those officers, police officers?

A. When I used to get in trouble, used to drink. You see, I have had several things taken away from me, some

mens react some way, some men react another way. I can recall when my wife Carrol Jayne and I separated. I had gotten money, I was trying to buy a home out in Price Hill, 3773 West Liberty Street. I had bought furniture and everything and her ex-boyfriend came out of the penitentiary and they took everything and I was left with nothing. So I started drinking because every time I attempt to try to get something for myself it's usually taken and nothing happened. The police was called then, nothing never happened. I am always the bad guy....

(Tr. Trans. at 474–476).

In the first sub-part, petitioner argues that the prosecutor used his post-arrest silence against him. Citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), petitioner asserts that during the prosecutor's cross-examination of Sowell, the prosecutor impermissibly referred to and questioned him regarding his decision to remain silent after being read his *Miranda* rights. Petitioner argues that this type of questioning is improper, and as a result of the prosecutor's remarks, he was "denied a fair trial on the issue of his guilt and denied his constitutional rights against self-incrimination when this evidence and argument were used as evidence of his guilt." (Petition, doc. # 9, at ¶ 255). Petitioner maintains that "[a] guilty verdict influenced by such improper and prejudicial comments is unreliable and cannot stand." (*Id.*).

In the second sub-part, petitioner argues that he was denied a fair trial because the prosecutor impermissibly questioned him concerning his prior contacts with the Cincinnati Police Department in an effort to establish his propensity to commit crimes and to do harm. (Doc. # 180, at 85). According to petitioner, the

prosecutor questioned him concerning how he knew the arresting officers in an effort to establish that petitioner had prior contacts with the officers when he was drinking. Petitioner claims that "[t]he purpose of the prosecutor's questions was obvious. The prosecutor sought to prove that Mr. Sowell was the sort of person who would shoot two unarmed people, and that no one would miss him if convicted." (*Id.* at 85–86). Such questioning is improper, petitioner argues, because due process requires that an accused be convicted on the basis of evidence concerning the offenses for which he is charged, and not based on other uncharged crimes he may have committed. Petitioner maintains that he suffered prejudice as a result of the prosecutor's improper questioning because the questioning, if believed, would lead the trier of fact to the conclusion that petitioner was predisposed to assaultive behavior and criminal activity. Therefore, petitioner claims that he is entitled to habeas relief as a result of the prosecutor's improper and prejudicial attacks on his character.

■ The appropriate standard of review for claims of prosecutorial misconduct on a writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). For prosecutorial misconduct to rise to the level of a constitutional violation, the conduct of the prosecutor must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Broom v. Mitchell,* 441 F.3d 392, 412 (6th Cir.2006) (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868); *see also Darden,* 477 U.S. at 181, 106 S.Ct. 2464. Thus, "Petitioner's burden on habeas re-

view is quite a substantial one." *Byrd v. Collins,* 209 F.3d 486, 529 (6th Cir.2000).

■ When analyzing a claim of prosecutorial misconduct, a federal court must first determine whether the challenged statements were improper. *Boyle v. Million,* 201 F.3d 711, 717 (6th Cir. 2000). If improper, the court must examine whether the statements were so flagrant as to constitute a denial of due process and warrant the granting of a writ. Even if the prosecution's conduct was improper, or even "universally condemned," a federal court can only reverse a conviction or sentence if the statements were so flagrant as to render the entire trial fundamentally unfair. *See e.g., Slagle v. Bagley,* 457 F.3d 501, 516 (6th Cir.2006). A court makes that determination by considering the following four factors:

> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

*Bates v. Bell,* 402 F.3d 635, 641 (6th Cir. 2005); *see also Bowling v. Parker,* 344 F.3d 487, 512–13 (6th Cir.2003). Relief will not be granted unless the conduct of the prosecutor "likely had a bearing on the outcome of the trial. . . ." *Byrd,* 209 F.3d at 530.

■ With respect to petitioner's first argument, it is well settled that once a defendant exercises his right to remain silent after being read his *Miranda* rights, his post-arrest silence cannot be used to his detriment at trial. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The *Doyle* rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to

impeach an explanation subsequently offered at trial." *Wainwright v. Greenfield,* 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Habeas relief must be granted if the *Doyle* violation "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under this standard, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637, 113 S.Ct. 1710 (quoting *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). In making this determination, the *Doyle* violation "'may ... be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial.'" *Id.* at 629, 96 S.Ct. 2240 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

With respect to petitioner's second argument, it is well settled that "a defendant's 'bad character' cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime." *Washington v. Hofbauer,* 228 F.3d 689, 699 (6th Cir.2000). Evidence of "other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity." *Wogenstahl v. Mitchell,* 2007 WL 2688423 (S.D.Ohio, Sept.12, 2007). However, it is well established that a federal habeas court may not provide relief for errors of state law. *See Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). To warrant the granting of a writ of habeas corpus, the petitioner must show that the admission of other acts evidence violated his right to a fundamentally fair trial under the Due Process Clause. *See Paige v.*

*Bradshaw,* 2007 WL 4323785, *12 (N.D.Oh. Apr.4, 2007).

In the instant matter, there can be little question that such direct reference by the prosecutor to petitioner's post-*Miranda* silence violated the standard elucidated in *Doyle.* *See, e.g., Mackey v. Russell,* 2005 WL 2175926 (6th Cir. Aug.9, 2005) (citing similar references as *Doyle* violations); *Gravley v. Mills,* 87 F.3d 779, 787–88 (6th Cir.1996) (same). Whether the prosecutor attempted to introduce evidence regarding petitioner's prior arrests and contacts with police is a closer question. However, even assuming that the conduct of the prosecutor was improper under Sixth Circuit precedent, the Court cannot conclude that prosecutorial misconduct affected the outcome of petitioner's trial.

On habeas review, the Court must consider whether the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Hill v. Brigano,* 199 F.3d 833, 847 (6th Cir.1999) (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868). The Court must consider the conduct of the prosecutor in light of the entire trial record, and again, with due regard to the usual presumption that in a bench trial in a criminal case, the trial court considered only the relevant, material, and competent evidence in arriving at its judgement, unless it affirmatively appears to the contrary. *See Harris v. Rivera,* 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (per curiam) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."); *United States v. Joseph,* 781 F.2d 549, 552–53 (6th Cir.1986) ("It is well settled that in a non-jury trial the introduction of incompetent evidence does not require a reversal in the absence of an affirmative showing of prejudice."); *Horacek v. White,* 2007 WL 3275077, *7 (E.D.Mich. Nov.5, 2007) ("[E]ven assuming

that Petitioner's prior convictions were inadmissible at trial, defense counsel's failure to attempt to limit the use of those convictions did not constitute deficient performance" because "Judges are presumed to ignore inadmissible evidence when making decisions in bench trials.").

In this case, petitioner points to no evidence, and the Court is unaware of any evidence, suggesting that the three-judge panel affirmatively relied upon the prosecutor's remarks concerning petitioner's refusal to make a statement and his prior contacts with police when determining petitioner's guilt. Moreover, the evidence of petitioner's guilt was overwhelming, and included two eyewitness accounts of the aggravated murder of Graham and the attempted aggravated murder of Billups, as well as petitioner's admission that he shot both victims. Based on the strength of the state's case, as well as the fact that petitioner's case was tried before a three-judge panel rather than a jury, the Court cannot find that prosecutorial misconduct significantly affected the outcome of petitioner's trial or rendered petitioner's trial fundamentally unfair.

**ARGUMENT NO. IX: THE PROSECUTOR FAILED TO PRODUCE SUFFICIENT EVIDENCE TO CONVICT APPELLANT OF AGGRAVATED MURDER AND THE ATTACHED CAPITAL SPECIFICATION.[12]**

Petitioner was convicted of aggravated murder, which under Ohio Revised Code § 2903.03(A)(1), requires a finding of prior calculation and design. In his ninth argument, petitioner claims that the facts presented at trial are insufficient to prove beyond a reasonable doubt that he acted with prior calculation and design. According to petitioner, "the State failed to show

that Mr. Sowell caused the death of Mr. Graham by prior calculation and design. Instead, the shootings were the product of a heated argument concerning the theft of Mr. Sowell's money at a time when Mr. Sowell's judgment was impaired by alcohol." (Doc.# 180, at 87). Petitioner argues that "[t]he fact that Mr. Sowell repeatedly shot Mr. Graham and Ms. Billups goes to whether the shootings were purposeful, not whether the homicide was committed with prior calculation and design." (*Id.* at 98).

It is well settled that the Due Process Clause protects an accused against conviction except upon proof beyond a reasonable doubt of every element necessary to constitute the crime with which he is charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court set forth the standard that a habeas court must employ when reviewing a claim of insufficient evidence. The habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. In applying *Jackson,* this Court's inquiry is limited to a consideration of the evidence adduced during the trial, because the "sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' *Jackson* does not extend to non-record evidence, including newly discovered evidence." *Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (citing *Jackson,* 443 U.S. at 318, 99 S.Ct. 2781). Furthermore, the habeas court is not permitted to

---

**12.** This Argument includes the Eleventh Ground for Relief. (Petition, doc.# 9, ¶¶ 252– 256; 257–267).

make its own subjective judgment of guilt or innocence; rather, "the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Montgomery v. Bagley,* 482 F.Supp.2d 919, 987 (N.D.Ohio 2007) (citing *Herrera,* 506 U.S. at 401–02, 113 S.Ct. 853).

 Under Ohio law, prior calculation and design means that "the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the instrument with which to cause the death of another." *Zuern v. Tate,* 336 F.3d 478, 482 (6th Cir.2003). Although there must have been "sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death," no particular amount of consideration must be given, and no definite period of time must elapse. *Id.* However, "[a]cting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient." *Id.* Furthermore, it is not necessary that the defendant have a plan to kill a specific person, because prior calculation and design can be found under the doctrine of transferred intent. That is, if one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder. Stated differently, "[p]rior calculation and design exists where the defendant plans to kill any member of a certain class of persons, even if he did not know in advance who the particular victim would be." *Id.* In such situations, the question is whether the totality of circumstances show a prior calculation and design to kill a member of a certain group. *Id.*

Ohio courts consider several factors in determining the existence of prior calculation and design. Those factors include whether the accused knew the victim prior to the crime, as opposed to a random meeting, whether the relationship between the accused and the victim was strained, whether the accused used thought and preparation to decide on the weapon and the site of the homicide, whether the act was drawn out over a period of time, or whether there was an "almost instantaneous eruption of events." *State v. Jenkins,* 48 Ohio App.2d 99, 103, 355 N.E.2d 825 (8th Dist.1976). Courts also consider whether there was a break or interruption in the encounter, giving time for reflection, whether the accused, at any time, expressed an intent to kill, the extent to which the accused pursued the victim, the number of shots fired, and whether the accused displayed a weapon from the outset or retrieved a weapon during the encounter. *See Taylor v. Mitchell,* 296 F.Supp.2d 784, 821–22 (N.D.Ohio 2003) (collecting cases).

Petitioner raised this sufficiency of the evidence claim on direct appeal to the Ohio Supreme Court. That court reviewed the evidence adduced at trial, and found that there was sufficient evidence for the panel to conclude that petitioner committed the instant offense with prior calculation and design. The Ohio Supreme Court reasoned:

> The trial court specifically found that appellant did not have prior calculation and design to kill Graham, but that he did have such prior calculation and design as to Billups. Both lower courts cite this court's decision in *State v. Solomon,* 66 Ohio St.2d 214, 218, 421 N.E.2d

139 (1981), to support the finding that appellant's intent was 'transferred' from Billups to Graham and, as a consequence, Graham was killed with prior calculation and design.

* * * *

In the cause *sub judice*, appellant had stated his intention to shoot Billups when he left Graham's apartment. After several minutes in his own apartment, the appellant returned and reiterated his intent to shoot Billups. In his attempt to carry out his design, appellant purposely and intentionally killed Graham. The first shot to Graham's midsection was succeeded by the firing of the shot into Graham's forehead. Clearly, Graham's death was the result of a scheme designed to implement the calculated decision to kill Billups. This action falls squarely within the confines of our holding in *Solomon*. Thus, the indictment is accurate in that appellant acted with prior calculation and design in killing Graham under the doctrine of transferred intent.

* * * *

The record reveals that the cause *sub judice* is not an example of instantaneous deliberation. Appellant left Graham's apartment, announcing his intention to get his gun and shoot Billups. He then went to his apartment and instructed Lenora Waugh to get his pistol. After about five or six minutes, appellant, accompanied by Waugh, returned to Graham's apartment. Appellant instructed Waugh to knock on the door and identify herself as a woman named 'Portia.' Appellant knew that this would cause Graham to open the door. When Graham did open the door, appellant forced his way into the apartment, firing his pistol into the ceiling. Again, appellant announced his intention to shoot Billups. The prior calculation and de-

sign was never 'abandoned.' Appellant was at Graham's apartment for the purpose of shooting Billups and he eventually accomplished that purpose. But for the lack of ammunition, his scheme would have been completed. The gun was placed at Billups' forehead and the trigger was pulled. The evidence demonstrates that appellant never 'abandoned' his scheme to kill Billups. Upon review of the entire record, we hold that the trial court, as trier of fact, was justified in finding the existence of prior calculation and design.

*State v. Sowell*, 39 Ohio St.3d 322, 330–33, 530 N.E.2d 1294 (1988).

 It is undisputed that petitioner shot and killed Calvert Graham, and shot Pamela Billups three times, although not fatally. The only contested issue is whether petitioner acted with the prior calculation and design needed for an aggravated murder conviction. Petitioner claims that he did not, and offers four arguments in support of his assertion that the state's evidence was insufficient to establish prior calculation and design beyond a reasonable doubt.

First, petitioner cites *State v. Jenkins*, 48 Ohio App.2d 99, 102–03, 355 N.E.2d 825 (8th Dist.1976). In *Jenkins*, the defendant was standing in the street next to his parked car when the victim drove by and yelled for the defendant to get out of the street. The defendant told the victim to pull over his car, he walked back several feet to where his own car was parked, opened his trunk, removed a shotgun, fired one shell into the victim's trunk, and then shot the victim twice. *Id.* at 102, 355 N.E.2d 825. The Eighth District Court of Appeals found insufficient evidence to support the defendant's conviction for aggravated murder. The court determined that the case involved a chance encounter, that there had been no previous or strained

relationship between the defendant and the victim, that the incident was not drawn out but was almost spontaneous, and that the evidence did not prove prior calculation and design. *Id.* at 103, 355 N.E.2d 825. Petitioner argues that the facts of his case are indistinguishable from *Jenkins* because he did not have a strained relationship with Graham, Edwards or Billups, and prior to the incident, they were all friends. (Doc. # 180, at 91). As in *Jenkins,* petitioner argues that the confrontation in this case was not drawn out, but happened very quickly, and that he got instantly angry when he awoke after having passed out and found that a large amount of his money was missing. (*Id.*).

Next, petitioner cites *State v. Davis,* 8 Ohio App.3d 205, 456 N.E.2d 1256 (8th Dist.1982). In *Davis,* the defendant shot the victim during an altercation at a bar. The defendant, Davis, tried to enter the bar without proper identification and was refused entry by the doorman and the bar owner. Davis became verbally and physically argumentative and challenged the doorman and owner to make him leave. When the owner and a patron tried to remove Davis from the bar, Davis shot the doorman, wounding him, and then shot the bar owner twice, killing him. *Id.* at 206, 456 N.E.2d 1256. The Ohio Court of Appeals for the Eighth Appellate District determined that the state did not prove prior calculation and design with respect to the murder of the bar owner. In so concluding, the court reasoned that Davis had not gone to the bar that night to shoot either of the men but "to have a good time," Davis went for his gun after being outnumbered and verbally attacked, and the state failed to present any evidence suggesting that there was a previous strained relationship between Davis and the doorman or the bar owner. *Id.* at 207, 456 N.E.2d 1256. The court of appeals found that the state had, at best, established "instantane-

ous premeditation." *Id.* Petitioner argues that like the situation in *Davis,* he went to Graham's apartment to have "a good time," had no intention of killing anyone when he went there, and he "not only felt that he was outnumbered, but that he had been robbed." (Doc. # 180, at 94).

Third, petitioner draws the Court's attention to *State v. Richardson,* 103 Ohio App.3d 21, 658 N.E.2d 321 (1st Dist.1995). In *Richardson,* the defendant, Richardson, became involved in a fist fight with Robert Payne. Payne struck Richardson and knocked him down. Richardson got up and walked a few steps to a building where his uncle handed him a gun. Payne ran down the street and hid behind a car. Richardson fired three shots at the car, and one of those shots fatally struck an innocent bystander. *Id.* at 23, 658 N.E.2d 321. The court held that the state failed to present any evidence that Richardson engaged in prior preparation to commit a murder. *Id.* at 25, 658 N.E.2d 321. Petitioner claims that the facts of his own case are even more favorable than the facts were to Richardson. Petitioner argues that like Richardson, he left the altercation to retrieve his gun. However, Richardson returned to the scene firing his gun. Petitioner, on the other hand, "still attempted to reason with the occupants to return his money" once he returned to Graham's apartment, and "[i]t was not until after he engaged in a further, heated, and unsuccessful debate that Mr. Sowell discharged his firearm." (Doc. # 180 at 95).

Finally, petitioner claims that he was too intoxicated to have committed the murder with prior calculation and design. Petitioner argues that "[i]ntoxication, although voluntary, may be considered to determine whether an act was done intentionally and/or with premeditation or deliberation." (*Id.* at 96). He states that prior to the murder, he visited four different bars and

consumed vodka, gin and beer in a short period of time. Immediately after returning from the bars, petitioner consumed more alcohol and marijuana at Graham's apartment, and passed out just before the murder. (*Id.*).

After considering each of the arguments advanced by petitioner, the Court finds that the cases cited by petitioner are distinguishable. Each of the above cases involved isolated incidents and chance encounters, and "instantaneous deliberation" that led to murder. Unlike *Jenkins* and *Davis,* the record in petitioner's case establishes that petitioner did have a strained relationship with Graham, Edwards, and Billups. Although petitioner had been friends with Graham for some time and went to Graham's apartment to have a "good time," once he was there on the day of the incident, he became very angry. Petitioner testified during his direct examination that he believed that Billups had stolen money from him a few days prior to the incident after he had bought her food and paid for a place for her to stay. In addition, petitioner was upset that Billups had acted as though she did not know him earlier in the day when he saw her and Edwards at the store. This was compounded by the fact that petitioner believed that someone in the apartment had just stolen money from him while he was passed out.

Moreover, the shootings did not occur as a result of an instantaneous eruption or one continuous course of events. There was an initial encounter and an exchange of hostile words between petitioner and Billups that generated a decision on petitioner's part to shoot and kill Billups. After arguing with Billups about whether she had taken his money, petitioner announced his intention to get his gun and kill Billups, and he put into action a plan to achieve that result. To that end, petitioner left

Graham's apartment, went down the hall to his own apartment, and retrieved his gun. Although the period of time that elapsed between the initial encounter and the shootings was brief, there was a break in the encounter, or an intervening period, during which there was a time for reflection and planning. During that time, petitioner retrieved his weapon from a different location and devised a plan to regain entry to Graham's apartment under false pretenses by using Lenora Waugh. Accordingly, the Court finds that there was sufficient time, under all of the circumstances, for petitioner to plan the killing.

Once petitioner entered the apartment, he shot each of the victims multiple times. He shot Graham in the stomach, and then fired a fatal shot into his head once Graham was on the floor. Petitioner pursued Billups, went to where she was trying to hide, and fired three shots into her body, stopping only when he ran out of bullets and his gun would no longer fire. Moreover, the Court finds that the fact that petitioner returned to the apartment and attempted to reason with the occupants, rather than shooting them immediately, tends to establish that petitioner made a deliberate decision to follow through on his threat to shoot Billups once the situation did not resolve itself as he had hoped it would.

Keeping in mind that a federal habeas court must view the evidence and draw all permissible inferences in favor of the state, the Court finds that the conduct of petitioner illustrated his determination to follow through on a specific course of action, which supports a finding that petitioner had previously adopted a plan to kill. Although it is theoretically possible that petitioner returned to the apartment with pure motives and once he was there, killed Graham and attempted to kill Billups in a moment of rage, this scenario does not

seem likely based on the record. Even if that scenario is possible, a rational trier of fact would likely find, on the evidence presented, that petitioner returned to kill them after calculating and forming a plan to do so. The Court notes that petitioner had an opportunity to explain his version of the events when he testified in his own defense. The fact that the three judge panel did not believe petitioner's testimony does not equate to a lack of sufficient evidence to convict him. Petitioner has demonstrated nothing more than that the panel rejected his recitation of the events.

With respect to petitioner's final argument concerning his intoxication at the time of the offense, it is true that, at the time of the instant offense, evidence of voluntary intoxication could be presented in Ohio to negate an element of specific intent such as the requirement of prior calculation and design. However, it is "only where the accused was 'so intoxicated as to be mentally unable to intend anything' will his intoxication create a reasonable doubt as to his ability to form the specific intent essential to the charged felony." *State v. Otte,* 74 Ohio St.3d 555, 564, 660 N.E.2d 711 (1996). That was not the case in this instance, as petitioner was able to devise a plan to retrieve his gun and regain entry into Graham's apartment in order to facilitate the instant offense. After he killed Graham and shot Billups, petitioner ensured that Donna Edwards stayed in the apartment and did not seek help until petitioner had time to vacate the building. Under these circumstances, it cannot be said that petitioner was so intoxicated that he could not intend anything.

For the foregoing reasons, the Court finds that the evidence in the record, viewed most favorably to the prosecution, was sufficient, pursuant to *Jackson,* to convict petitioner of aggravated murder. A rational trier of fact could conclude that petitioner had formed a calculated decision to commit murder, and reasonable minds could conclude that the state set forth sufficient evidence to establish that petitioner acted with prior calculation and design. Therefore, petitioner's ninth argument lacks merit.

**ARGUMENT NO. X: APPELLATE COUNSELS' ACTS AND OMISSIONS DEPRIVED MR. SOWELL OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN HIS APPEAL OF RIGHT TO THE OHIO SUPREME COURT.[13]**

In his tenth argument, petitioner sets forth five claims of ineffective assistance of appellate counsel on direct appeal to the Ohio Supreme Court. Petitioner argues that appellate counsel's performance, on direct appeal to the Ohio Supreme Court, was deficient because counsel failed to raise two separate *Doyle* violations, failed to raise a claim of prosecutorial misconduct based on the prosecutor's improper cross-examination of petitioner concerning his prior contacts with law enforcement, failed to raise a claim of trial court error and bias due to the court's *ex parte* investigation into whether petitioner committed other murders, and failed to argue that the Victim Impact Statement submitted by the Cincinnati Police Department contained inaccurate information concerning petitioner's cooperation during and after his arrest. (Doc. # 180, at 101–05). Petitioner argues that he suffered prejudice as a result of appellate counsel's failure to raise the above claims because the Ohio Supreme Court did not review the potentially meritorious issues.

---

**13.** This Argument includes the Thirty–Eighth Ground for Relief. (Petition, doc.# 9, ¶¶ 533– 538).

Respondent argues that petitioner's claims of ineffective assistance of counsel during his second appeal as of right before the Ohio Supreme Court are without merit because "Sowell had no federal constitutional right to the effective assistance of appellate counsel on his second appeal as of right." (Doc. # 187, at 35). According to respondent, the right to counsel, and therefore the right to the effective assistance of counsel, extends only to the *first* appeal of right, not to the second. The Court need not consider whether respondent's contention is correct, because even assuming that such a right did exist in death penalty cases, petitioner's claims lack merit.[14]

■ The *Strickland* test applies to claims of ineffective assistance of appellate counsel. *Burger v. Kemp*, 483 U.S. 776, 781–82, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Counsel must provide reasonable professional judgement in presenting an appeal. *Evitts v. Lucey*, 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). "[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). *But see Smith v. Anderson*, 104 F.Supp.2d 773, 839 (S.D.Ohio 2000) ("This Court believes that, in capital cases, appellate counsel should approach the traditional process of winnowing out claims with extreme caution."); *Jamison v. Collins*, 100 F.Supp.2d 647, 740–41 (S.D.Ohio 2000) ("[W]e believe that any 'winnowing' or narrowing of issues must be done very cautiously when a person's life is at stake."). The Sixth Circuit has suggested eleven factors to consider when examining whether appellate counsel was ineffective:

(1) Were the omitted issues 'significant and obvious'?

(2) Was there arguably contrary authority on the omitted issues?

(3) Were the omitted issues clearly stronger than those presented?

(4) Were the omitted issues objected to at trial?

(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7) What was appellate counsel's level of experience and expertise?

(8) Did the petitioner and appellate counsel meet and go over possible issues?

(9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

---

**14.** The Ohio Supreme Court has determined that there is no right to counsel on a second appeal as of right. *See State v. Buell*, 70 Ohio St.3d 1211, 1212, 639 N.E.2d 110 (1994) (finding that the right to appointed counsel in Ohio "extends to the *first* appeal as of right, *and no further*") (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)); *but see Hernandez v. Greiner*, 414 F.3d 266, 269 (2nd Cir.2005) (noting that the Supreme Court has never been presented with the issue of whether the right to counsel attaches to all appeals *as of right* on direct review of a criminal conviction but recognizing that dicta "strongly suggest[s] that there is no right to counsel on any appeal beyond a first-level appeal as of right, whether the second-level appeal is discretionary or even of right").

*Mapes v. Coyle,* 171 F.3d 408, 427–28 (6th Cir.1999). This Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score." *Id.* at 428.

In prior sections of this *Opinion and Order,* the Court has considered and rejected the merits of each of the underlying claims that petitioner asserts his appellate counsel should have raised on direct appeal to the Ohio Supreme Court. Specifically, in addressing petitioner's eighth argument, the Court determined that petitioner was not entitled to habeas relief due to the *Doyle* violations or prosecutorial misconduct. In the section resolving petitioner's fifth argument, the court determined that petitioner could not prevail on his claim challenging the admission of the Victim Impact Statement of the Cincinnati Police Department. Likewise, in the section addressing petitioner's fourth argument, the Court determined that petitioner was not entitled to relief on his claim that the trial court deprived him of a fair trial by ordering an ex parte investigation into whether petitioner was responsible for other murders. Because none of the underlying claims are meritorious, appellate counsel cannot be said to be deficient for failing to raise them on appeal, and they are insufficient to sustain a claim of ineffective assistance of appellate counsel. Furthermore, having reviewed appellate counsel's brief on direct appeal with a mind toward comparing the relative strength of the issues that counsel omitted to that of the sixteen issues that counsel did raise, and fully mindful of all of the *Mapes* factors, this Court cannot conclude that petitioner's appellate counsel performed deficiently or to petitioner's prejudice in failing to raise the claims set forth above.

*ARGUMENT XI:* MR. SOWELL'S CONVICTION AND DEATH SENTENCE ARE CONSTITUTIONALLY INFIRM DUE TO THE CUMULATIVE ERRORS IN THE ADMISSION OF EVIDENCE, MISCONDUCT BY STATE OFFICIALS, AND THE SYSTEMATIC DEPRIVATION OF HIS EFFECTIVE ASSISTANCE OF COUNSEL[15]

Finally, petitioner argues that even if none of the trial, sentencing or appellate errors he alleges warrants habeas relief individually, their collective effect violated his constitutional right to due process of law. Assuming without deciding that cumulative error can form the basis for habeas relief in a case that is not governed by the AEDPA, the Court need not decide whether petitioner is entitled to such relief in this case. The Court has determined that petitioner's claim of ineffective assistance of counsel at mitigation is meritorious in its own right, and there are no additional claims to accumulate to it. Therefore, the Court denies petitioner's final argument as moot.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the writ should be granted in part and denied in part. Petitioner's claim of ineffective assistance of counsel during the mitigation phase of his trial, as set forth in his first argument, is meritorious and the Court finds that the Writ of Habeas Corpus should be granted as to this claim. The State of Ohio shall, within one hundred and eighty (180) days, commute petitioner's sentence of death or grant petitioner a new mitigation hearing.

Accordingly the Writ of Habeas Corpus is **GRANTED,** conditioned upon the foregoing. Petitioner's remaining habeas corpus claims are **DENIED.** This order in-

---

**15.** This Argument includes the First Ground for Relief. (Petition, doc.# 9, ¶¶ 1–181).

validates only petitioner's death sentence, and nothing in this order invalidates or calls into question petitioner's underlying convictions or the other sentences that he received in addition to his death sentence. The clerk is hereby directed to enter judgment closing this case.

**IT IS SO ORDERED.**